146 P.3d 89

Clarence S. ONAKA, Plaintiff–Appellee,

v.

Allyson L. ONAKA, Defendant–Appellant.

No. 24463.

Supreme Court of Hawai'i.

Aug. 30, 2006.

Reconsideration Denied Sept. 20, 2006.

Terry L. Day, on the briefs, for defendant-appellant, Allyson Lesli Onaka.

Joy Yanagida, on the briefs, Wailuku, for plaintiff-appellee, Clarence Shizuo Onaka.

MOON, C.J., LEVINSON, NAKAYAMA, ACOBA, and DUFFY, JJ.

Opinion of the Court by Nakayama, J.

Allyson Lesli Onaka [hereinafter "Allyson"] appeals from twenty-four orders of the second circuit family court[1] concerning the division of property and debts. On appeal, this court is faced with the following two issues: (1) Clarence Shizuo Onaka's [hereinafter "Clarence"] argument that this court lacks jurisdiction inasmuch as Allyson's multiple notices of appeal were either invalid or untimely; and (2) Allyson's contention that the family court violated her due process right to be present at trial by denying her motions to continue, which were based upon her alleged inability to travel due to her pregnancy. Although Allyson presents other points of error on appeal, they fail to comply with the mandatory requirements of the Hawai‘i Rules of Appellate Procedure [hereinafter "HRAP"] Rule 28(b)(4). Accordingly

---

1. The Honorable Eric G. Romanchak presided.

they have not been properly preserved for appeal and we do not address them.

Based upon the following analysis, we conclude that Allyson's August 3, 2001 notice of appeal vested this court with jurisdiction and that the family court did not violate Allyson's due process right to be present. Accordingly, we affirm the orders appealed from.

## I. BACKGROUND

### A. Factual Background

Allyson and Clarence resided on Maui and were married on August 1, 1986. Clarence's primary income was derived from Tasty Crust Restaurant [hereinafter "Tasty Crust"], an establishment that he purchased in August 1982. Clarence also owned a business known as Quality Lighting and Supply Co. [hereinafter "Quality Lighting"]. Allyson managed Quality Lighting from approximately 1989 to 1996. Allyson also helped Clarence manage several real estate properties located in Hawai'i and Nevada, which were acquired during the pendency of the marriage.

In March 1996, Allyson and Clarence separated. Allyson thereafter moved to Las Vegas, Nevada.

### B. Procedural Background

On August 27, 1996, Clarence filed a complaint for divorce in the second circuit family court. The court entered a divorce decree on December 30, 1999, bifurcating the proceedings and reserving the property division issues for trial.

#### 1. *Allyson's motions to continue*

Amidst chaotic pretrial proceedings, Allyson filed a motion to continue trial, which was scheduled to commence on January 20, 2000. Her initial motion, filed on November 19, 1999, requested a continuance to permit her attorneys more time to obtain and review additional documents and potentially depose persons identified on Clarence's witness list.

2. Allyson's pregnancy was the result of her intimate relationship with William Bernard.

3. On February 23, 2000, the court memorialized its oral rulings in an "Order Granting In Part

On November 29, 1999, Allyson filed a supplemental affidavit offering an additional, more compelling reason to continue trial. Therein, she claimed that she was pregnant[2] and that the high-risk nature of her pregnancy made it impossible for her to travel to Hawai'i to attend trial. Allyson thus requested that the court continue trial until after her date of delivery, approximated to occur on May 22, 2000. The court thereafter ordered Allyson to submit to an independent medical examination to verify her medical condition.

On January 5, 2000, the court conducted an evidentiary hearing, at which Allyson's treating physician, Dr. Richard Litt, testified by telephone in support of Allyson's motion, stating that "[s]he is a high risk patient because of her age, the fact that she's had two ectopic pregnancies, one (inaudible) resection, and she's had some recent vaginal bleeding (inaudible) unknown etiology[,]" and that she should "[s]tay off her feet as much as possible, no travel, no exercise, no intercourse, no stress, no strain, to lead as quiet a time as she can until the baby is delivered." To the contrary, the doctor who conducted the independent medical examination, Dr. Benjamin Berry, testified that traveling to Hawai'i for trial during the second trimester of pregnancy would not increase the risk of harm to either Allyson or her unborn child. The court considered the testimony of both doctors, but concluded that Dr. Berry was more credible and denied Allyson's motion on the basis of her pregnancy. Nevertheless, the court continued trial until February 17, 2000, based upon Allyson's attorney's representation that approximately eight-thousand pages of documents had yet to be reviewed.[3]

On February 15, 2000, Allyson filed another motion for a continuance alleging a medical relapse and degenerating health. She asserted that because the family court ordered her to be present at a pretrial conference on February 15, 2000, she attempted to comply by traveling from Las Vegas, Nevada

And Denying In Part Defendant's Motion To Continue Trial And Extend And Clarify Discovery Cutoff Filed On November 19, 1999."

to Los Angeles, California on February 13, 2000. She further alleged that she suffered an episode of elevated blood pressure while in transit and subsequently visited Dr. Robert Karns, a physician located in Beverly Hills. Dr. Karns determined that she was "too brittle" to travel, and that "[s]uch an elevated blood pressure was consistent with preeclampsia, and could pose great danger to both mother and child." Also, Dr. Litt was dismayed when he discovered Allyson's attempt to travel to Hawai'i, and stated, by letter, that Allyson suffered from anxiety attacks, preeclampsia, and gestational diabetes.

On February 17, 2000, the first day of trial, the family court denied Allyson's February 15, 2000 motion to continue. The court first noted that the parties had stipulated to the fact that Allyson was, at that time, unable to fly from Las Vegas, Nevada to Maui, Hawai'i. However, balancing the rights of the parties, and based upon a consideration of the record, the court determined that trial should commence. In order to mitigate the prejudice to Allyson, the court ordered that she be permitted to participate *de bene esse*, by videotaped deposition. Allyson nevertheless declined to take advantage of the court's accommodation because of the alleged "dangers that such a procedure would create for [her] and her baby."

### 2. *Trial*

Trial commenced on February 17, 2000 and concluded on February 24, 2000, without Allyson's presence.[4]

On June 8, 2000, the family court filed its findings of fact and conclusions of law. The court also filed its property division order,

*inter alia,* (1) awarding title and possession of all of the marital real estate properties to Clarence, subject to all indebtedness secured by the properties and owed on account of the use and ownership thereof, (2) quashing all of the *lis pendens* filed by Allyson in connection with other civil actions filed by her, (3) ordering Clarence to assume and pay all current debts owed to his parents, Tsuneo and Nancy Onaka, and his sister, Karen Burry–Onaka, (4) ordering Allyson to pay Clarence the amount of $227,178.96 for the wasting of assets belonging to Tasty Crust and Quality Lighting, and (5) awarding Clarence attorneys' fees and costs based upon multiple sanctions imposed on Allyson.[5]

### 3. *Family court post-decree proceedings*

On June 20, 2000, Clarence filed a motion requesting that the family court adopt three additional findings of fact—clarifying whether the family court adjudicated Allyson's claim that Clarence wasted marital assets—for the benefit of the circuit court judge presiding over a separate civil proceeding filed by Allyson.[6]

On June 23, 2000, Clarence filed a motion for fees and costs in the amount of $262,181.15, pursuant to Hawai'i Family Court Rules [hereinafter "HFCR"] Rule 68.[7]

On October 1, 2000, Clarence filed a motion to amend the family court's findings of fact to reflect that Allyson moved her residence from Las Vegas, Nevada to Cedar City, Utah on February 28, 2000.

On November 13, 2000, the family court filed three post-decree orders granting each of the foregoing motions.[8]

---

4. However, Allyson's attorneys were present at each stage of the litigation.

5. On July 7, 2000, Allyson filed a notice of appeal from, *inter alia,* the family court's June 8, 2000 property division order, thereby commencing appeal number 23577. However, on January 31, 2001, this court dismissed appeal number 23577 for lack of jurisdiction inasmuch as Allyson's July 7, 2000 notice of appeal violated the automatic stay triggered by a bankruptcy petition filed by her on June 20, 2000.

6. Allyson filed a memorandum in opposition on July 10, 2000.

7. Allyson filed a memorandum in opposition on July 10, 2000.

8. Allyson filed her second notice of appeal on December 11, 2000, appealing from these post-decree orders, thereby commencing appeal number 23944. However, on March 27, 2001, this court dismissed appeal number 23944 for lack of jurisdiction insofar as Allyson's December 11, 2000 notice of appeal was filed in violation of the automatic stay.

#### 4. *Bankruptcy proceedings*

Allyson filed a petition for bankruptcy in the United States Bankruptcy Court for the District of Utah on June 20, 2000.

Clarence thereafter filed a motion in the bankruptcy court requesting relief from the automatic stay triggered by Allyson's bankruptcy petition. On September 20, 2000, following a hearing held on September 5, 2000, the bankruptcy court granted Clarence's motion and lifted the stay for the limited purpose of enforcing the June 8, 2000 property division order.

On September 26, 2000, Clarence filed a complaint for an adversary proceeding in the bankruptcy court, arguing that (1) the obligations imposed by the June 8, 2000 property division order were not dischargeable pursuant to 11 U.S.C. § 523(a)(15), and (2) Allyson failed to fully and accurately disclose her assets and liabilities, and therefore should be denied discharge pursuant to 11 U.S.C. § 727(a)(4).

On July 11, 2001, the bankruptcy court filed an "Order Discharging Debtor." Thereafter, on July 27, 2001, the bankruptcy court filed an order entitled, "Final Decree And Case Closed."

On August 3, 2001, Allyson filed a notice of appeal, thereby initiating the present appellate proceedings.[9]

On August 21, 2001, the bankruptcy court commenced a separate, two-day trial to adjudicate whether Allyson's debt to Clarence was dischargeable. On September 18, 2001, the court filed a judgment discharging Allyson's debts to Clarence as established in the June 8, 2000 property division order.

## II. STANDARDS OF REVIEW

### A. Constitutional Questions

■ We review questions of constitutional law *de novo*, under the right/wrong standard. *See State v. Friedman*, 93 Hawai'i 63, 67, 996 P.2d 268, 273 (2000) ("We answer questions of constitutional law by exercising our own independent constitutional judgment based on the facts of the case. Thus, we review questions of constitutional law under the right/wrong standard.") (Quotation marks omitted.) (Citations omitted.).

### B. Motions to Continue

■ We review a trial court's decision to grant or deny a motion to continue for an abuse of discretion. *See State v. Escobido–Ortiz*, 109 Hawai'i 359, 364, 126 P.3d 402, 407 (App.2005) ("The trial court's decision to grant or deny a continuance is reviewed for an abuse of discretion."); *State v. Lee*, 9 Haw.App. 600, 603, 856 P.2d 1279, 1281 (1993) ("A motion for continuance is addressed to the sound discretion of the trial court, and the court's ruling will not be disturbed on appeal absent a showing of abuse of that discretion."), *reconsideration denied*, 9 Haw.App. 660, 861 P.2d 767, *cert. denied*, 75 Haw. 581, 861 P.2d 735 (1993); *State v. Gager*, 45 Haw. 478, 488, 370 P.2d 739, 745 (1962) ("The granting of a continuance is within the discretion of the trial judge and is not reviewable except for abuse of that discretion.").

■ It is well established that "[a]n abuse of discretion occurs if the trial court has clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party-litigant." *Keahole Def. Coalition, Inc. v. Bd. of Land and Natural Res.*, 110 Hawai'i 419, 436, 134 P.3d 585, 602 (2006) (citations omitted).

## III. DISCUSSION

### A. Jurisdiction

■ Clarence contests the jurisdiction of this court to hear the present appeal. Thus, we initially retain jurisdiction to decide the jurisdictional issue. *See State v. Bohannon*, 102 Hawai'i 228, 234, 74 P.3d 980, 986 (2003) ("A court always has jurisdiction to determine whether it has jurisdiction over a particular case.") (Quotation marks omitted.)

---

9. She subsequently filed an amended notice of appeal on October 30, 2001 to correct clerical errors in the August 3, 2001 notice.

(Citing *State v. Brandimart*, 68 Haw. 495, 496, 720 P.2d 1009, 1010 (1986).).)

Clarence argues that Allyson is barred from pursuing her appeal insofar as: (1) this court dismissed her July 7, 2000 and December 11, 2000 notices of appeal as invalid; (2) the automatic bankruptcy stay continued until the termination of Clarence's adversary proceeding on September 18, 2001, thus rendering Allyson's August 3, 2001 notice of appeal void absent retroactive annulment; and (3) Allyson's October 30, 2001 "amended notice of appeal" was filed more than thirty days after the September 18, 2001 termination of Clarence's adversary proceeding and was thus untimely.

■ Allyson, on the other hand, argues that her first two appeals were dismissed without prejudice based on a lack of jurisdiction created by the automatic stay in effect during the pendency of her bankruptcy case, and that her August 3, 2001 notice of appeal was timely under both bankruptcy law and the applicable appellate rules. We agree.

11 U.S.C. § 362 (2000) provides, in relevant part, that

> a petition filed under section 301, 302, or 303 of this title ... operates as a stay, applicable to all entities, of ... the commencement or continuation ... of a judicial, administrative or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title[.]

Pursuant to the foregoing language, we dismissed two of Allyson's prior attempts to pursue an appeal, insofar as her July 7, 2000 and December 11, 2000 notices of appeal violated the automatic stay.[10]

However, despite the invalidity of her first two notices of appeal, Allyson's third notice of appeal, filed on August 3, 2001, adequately vested this court with jurisdiction inasmuch as the automatic stay had been previously terminated on July 11, 2001.

11 U.S.C. § 362(c) provides, in pertinent part, that

> (2) the stay of any other act under subsection (a) of this section continues until the earliest of—
>
> (A) the time the case is closed;
>
> (B) the time the case is dismissed; or
>
> (C) *if the case is a case under chapter 7 of this title* concerning an individual or a case under chapter 9, 11, 12, or 13 of this title, *the time a discharge is granted or denied*[.]

(Emphases added.) As previously mentioned, the bankruptcy court filed an order discharging Allyson's debts on July 11, 2001. That discharge terminated the automatic stay pursuant to the express terms of 11 U.S.C. § 362(c)(2)(C).

Clarence attempts to circumnavigate the foregoing conclusion by asserting that the July 11, 2001 discharge was not effective as to him insofar as his September 26, 2000 adversary proceeding objecting to Allyson's discharge was still pending. He concludes that the automatic stay continued until September 18, 2001 when the bankruptcy court entered its judgment in favor of Allyson, thereby rejecting Clarence's objection to Allyson's discharge. However, Clarence's position is untenable insofar as an adversary proceeding is a proceeding distinguishable from the bankruptcy case.[11] 11 U.S.C. § 362(c) expressly binds the life of an auto-

---

10. *See* 8A C.J.S. *Bankruptcy* § 67 (1988) ("[T]he automatic stay includes a stay of the commencement or continuation of a judicial action or proceeding against the debtor that was or could have been commenced prepetition, or to recover a prepetition claim. *This provision applies to appeals in actions against the debtor, regardless of whether the debtor is an appellant or an appellee.*") (Footnotes omitted.) (Emphasis added.).

11. 10 *Collier on Bankruptcy* ¶ 7003.02 (Alan N. Resnick et al. eds., 15th ed. rev.2006) describes the distinction as follows:

> The adversary proceeding, which is commenced by filing a complaint pursuant to Bankruptcy Rule 7003, must be differentiated from the Code case itself. The commencement of the Code case is commenced by filing a petition, as provided in Bankruptcy Rule 1002(a) and sections 301–303 of the Code. The word "case" means the entire matter that is before the court. Within the context of the case there may be proceedings to resolve disputes; one type of such proceedings is defined as an "adversary proceeding"; proceedings that would fit within that definition are specified in Bankruptcy Rule 7001.

matic stay to the *case*—not to a related adversary proceeding—and thus where a discharge is granted in the *case*, the mere continued existence of a related adversary proceeding is of no consequence. *See Moody v. Comm'r of Internal Revenue*, 95 T.C. 655, 664, 1990 WL 210334 (1990) (concluding that the bankruptcy court's confirmation of a chapter 11 plan constituted a discharge and that "the existence of a pending adversary proceeding [did] not serve to continue the stay."); *cf. Allison v. Comm'r of Internal Revenue*, 97 T.C. 544, 548, 1991 WL 238314 (1991) ("Accordingly, we hold that when a bankruptcy case is closed, dismissed *or a discharge has been granted or denied* pursuant to 11 U.S.C. section 362(c)(2), the automatic stay is terminated, and the reopening of a case does not, absent an order from the bankruptcy court, reimpose the stay.") (Emphasis added.).

Having concluded that the automatic stay terminated on July 11, 2001, the remainder of the analysis is perfunctory. HRAP Rule 54 (2001) provides, in relevant part, that

> [w]henever a federal bankruptcy court lifts or terminates a stay of proceedings that has been entered with respect to a civil case in which an appeal is permitted by law and no notice of appeal has been filed, the provisions of Rule 4 shall apply as if the date of lifting or termination of the stay was the date of entry of the judgment appealed from[.]

HRAP Rule 4 (2001) mandates, in relevant part, that "the notice of appeal shall be filed within 30 days after entry of the judgment or appealable order." Accordingly, Allyson was required to file her notice of appeal within thirty days after the lifting or termination of the automatic stay, or July 11, 2001.

■ We prudentially note that Clarence contests the applicability of HRAP Rule 54 insofar as two notices of appeal have, in fact, been filed. However, Clarence overlooks the fact that both notices of appeal were inadequate to vest this court with jurisdiction insofar as they were filed during the pendency of the automatic stay. Generally, most courts consider actions taken in violation of an automatic stay void. *See In re Halas*, 249 B.R. 182, 191 (Bankr.N.D.Ill.2000) ("Some courts have held that actions taken in violation of the stay are voidable.... Most courts, however, have found such actions to be void."); *Bronson v. United States*, 46 F.3d 1573, 1577 (Fed.Cir.1995) ("A majority of the circuits have held that actions taken in violation of the automatic stay are void.") (Footnotes omitted.); 3 *Collier on Bankruptcy* ¶ 362.11[1] (Alan N. Resnick et al. eds., 15th ed. rev. 2006) ("Most courts have held that actions taken in violation of the stay are void and without effect."). Actions that are void have no legal effect. *See Black's Law Dictionary* 1573 (6th ed.1990) (defining the term "void" as "having no legal force or binding effect"). Applying that definition, the situation wherein two notices of appeal have been filed without legal effect is the functional equivalent of the situation wherein no notice of appeal has been filed. Thus, Allyson's appeal violates neither the letter nor the spirit of HRAP Rule 54.

Based upon the foregoing analysis, we believe that Allyson complied with the requirements of HRAP Rules 54 and 4 by filing her notice of appeal on August 3, 2001. Her notice of appeal thus serves as an appropriate conduit through which we are vested with jurisdiction. Having resolved the jurisdictional matter, we next consider the merits of the arguments that have been properly presented.

## B. Motions to Continue

■ Allyson's first point of error asserts that the family court violated her due process right to be present when it denied her November 19, 1999 and February 15, 2000 motions to continue trial. More specifically, Allyson argues that she was physically unable to travel to Maui to attend trial due to her high-risk pregnancy and other related impairments, and that the family court's refusal to grant her motions effectively denied her fundamental right to be present at every stage of her civil proceeding. We disagree.

■ It is well settled that an accused has a fundamental right to be present at each critical stage of the criminal proceeding. *See Rushen v. Spain*, 464 U.S. 114, 117, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983) (stating that the

right to personal appearance at every critical stage of the trial constitutes a "fundamental right[ ] of each criminal defendant"); *Diaz v. United States*, 223 U.S. 442, 455, 32 S.Ct. 250, 56 L.Ed. 500 (1912) (stating that a criminal defendant's right to be present at every stage of trial is "scarcely less important to the accused than the right of trial itself"). Although it is generally acknowledged that civil litigants have a similar right to be present,[12] it is equally clear that the right is not absolute.[13] Nevertheless, the arbitrary denial of a civil litigant's right to be present implicates the due process clause of the fifth amendment to the United States Constitution. *See Helminski v. Ayerst Labs.*, 766 F.2d 208, 213 (6th Cir.1985) ("We believe that the extent of a civil litigant's right to be present at trial is appropriately analyzed under the due process clause of the Fifth Amendment."), *cert. denied*, 474 U.S. 981, 106 S.Ct. 386, 88 L.Ed.2d 339 (1985).

The foregoing precedent clearly establishes that Allyson had a qualified right to be present at her civil trial. Here, however, that right was unobstructed inasmuch as the family court did not preclude Allyson from attending. Rather, the court merely denied

---

**12.** *See Green v. North Arundel Hosp. Ass'n, Inc.*, 366 Md. 597, 785 A.2d 361, 373 (2001) ("In concert with courts throughout the country, we have made clear that a party to a civil litigation has a right to be present for and to participate in the trial of his/her case."); *In re Valle*, 31 S.W.3d 566, 573 (Tenn.Ct.App.2000) ("[W]e generally recognize that the party litigant is entitled to be present in all stages of the actual trial of the case."); *Cary by and through Cary v. Oneok, Inc.*, 940 P.2d 201, 204 (Okla.1997) ("The ideals behind due process and a fair trial permit a party to be present in the courtroom absent extreme conditions[.]"); *Mason v. Moore*, 226 A.D.2d 993, 994, 641 N.Y.S.2d 195, 197 (N.Y.A.D.1996) ("It is axiomatic that, absent an express waiver or unusual circumstances, a party to a civil action is entitled to be present during all stages of trial[.]"); *Nussbaum v. Steinberg*, 162 Misc.2d 524, 525, 618 N.Y.S.2d 168, 168 (N.Y.Sup.1994) ("There is no question that the due process clause of the Constitution provides every litigant the right to be present during every stage of the trial of an action[.]"); *Reems v. St. Joseph's Hosp. & Health Center*, 536 N.W.2d 666, 669 (N.D. 1995) ("Due process and the right to a fair trial ordinarily preclude courts from excluding those parties who are able to understand the proceedings and to assist counsel in the presentation of their actions."); *Ferrigno v. Yoder*, 495 So.2d 886, 888 (Fla.Ct.App.1986) ("[W]e find the right of a *party* to be present at each stage of a lawsuit virtually sacrosanct and certainly paramount to an opposing party's mere fear of dove-tailed or hand-made testimony.") (Emphasis in original.); *Helfferich v. Farley*, 36 Conn.Supp. 333, 419 A.2d 913, 914 (1980) ("The right of a party to be present during the course of trial is basic to the trial process."); *Brons v. Bischoff*, 89 Wis.2d 80, 277 N.W.2d 854, 858 (1979) ("The general rule is that a party to a civil action has a right to be present at trial."); *Village of Elmwood Park v. Keegan*, 26 Ill.App.3d 925, 326 N.E.2d 92, 93 (1975) ("Generally, a rule that assures fundamental fairness applies to all cases, civil as well as criminal.... So it is with the rule that gives a defendant the right to be present at the trial of his case."); *Burke v. Scott*, 410 S.W.2d 826, 829 (Tex.Civ.App.1967) ("In addition to the right to be physically and mentally able to aid in the preparation of his trial, a litigant also has the valuable right to be present at his trial for reasons that are obvious."); *Raper v. Berrier*, 246 N.C. 193, 97 S.E.2d 782, 784 (1957) ("The public, and especially the parties are entitled to see and hear what goes on in the courts."); *Fillippon v. Albion Vein Slate Co.*, 250 U.S. 76, 81, 39 S.Ct. 435, 63 L.Ed. 853 (1919) ("We entertain no doubt that the orderly conduct of a trial by jury, essential to the proper protection of the right to be heard, entitles the parties who attend for the purpose to be present in person or by counsel at all proceedings from the time the jury is impaneled until it is discharged after rendering the verdict.").

**13.** *See Brown v. Yettaw*, 116. S.W.3d 733, 735 (Mo.Ct.App.2003) ("Whether a trial court has abused its discretion in proceeding to trial and judgment in the absence of a party or his attorney must be determined upon the particular facts and circumstances in the case under consideration.") (Quotation marks omitted.) (Citing *Sav. Fin. Corp. v. Blair*, 280 S.W.2d 675, 679 (Mo.Ct.App.1955).); *In re Robert "U"*, 283 A.D.2d 689, 690, 724 N.Y.S.2d 527, 529 (2001) ("It is now well settled that a litigant does not have an absolute right to be present at all stages of a civil proceeding[.]"); *Nussbaum*, 162 Misc.2d at 525, 618 N.Y.S.2d at 169 ("The defendant's right to be present at a civil trial is not absolute."); *Matter of Donna K.*, 132 A.D.2d 1004, 1004, 518 N.Y.S.2d 289, 290 (N.Y.A.D. 1987) ("While every litigant has a fundamental right, guaranteed by the due process clause of both the Federal and State Constitutions, to be present at every stage of the trial ... this right is not absolute in civil actions[.]"); *Air Products & Chemicals, Inc. v. Johnson*, 296 Pa.Super. 405, 442 A.2d 1114, 1128 (1982) ("While we recognize that the right of a litigant to be present at the time his case is heard is a cherished right ... we also are aware that the right is not absolute."); *Casson v. Horton*, 226 Md. 575, 174 A.2d 581, 582 (1961) (holding that a civil litigant "had no absolute right to be present.").

her motion to continue, and she had no fundamental right to have trial commence at the time of her choosing.

Absent violation of a fundamental right, the relevant inquiry is whether the family court abused its discretion insofar as it is axiomatic that the decision to grant or deny a motion to continue is within the discretionary realm of the trial court and will be upheld absent a showing of an abuse of that discretion. *See C.S. v. People*, 83 P.3d 627, 638 (Colo.2004) ("Because the denial of C.S.'s motion to continue did not affect her fundamental rights, we review the district court's order only for abuse of discretion."); *see also* discussion at Part II.B. *supra.*

### 1. *November 19, 1999 motion to continue*

█ Here, the record indicates that Allyson's first motion to continue was filed on November 19, 1999. In support of her motion, Allyson presented the family court with the testimony of her treating physician, Dr. Litt, indicating that Allyson suffered from the following maladies: (1) a history of epilepsy; (2) a high-risk pregnancy "because of her age, the fact that she's had two ectopic pregnancies, one (inaudible) resection, and she's had some recent vaginal bleeding (inaudible) unknown etiology"; and (3) an "increased risk for hypertension, gestational diabetes and abnormal labors." Dr. Litt also testified that Allyson previously underwent a surgical operation during which the top portion of her uterus was removed, thus increasing the risk of rupture as her pregnancy progressed and she increased in size. Dr. Litt ultimately recommended that Allyson "[s]tay off her feet as much as possible, no travel, no exercise, no intercourse, no stress, no strain, [and] lead as quiet a time as she can until the baby is delivered."

By contrast, Dr. Benjamin Berry, testified that Allyson was capable of traveling to Hawai'i during her second trimester. Dr. Berry conducted an independent medical examination, and reported his findings to the family court as follows:

A. Based upon objective findings from her ultra sound examination and review of her medical records, I came to the conclusion that she would be able to fly to Hawaii during her second trimester without increasing risk of harm to herself or her unborn child.

Q. I'd like to refer you to—I'm sorry.

Do you feel that physical examination would have changed that evaluation?

A. No.

Q. Why is that?

A. Based on the objective evidence of the ultra sound examination performed on December 16th, there was enviable intrauterine pregnancy with a normal placental location.

There had been normal growth from the initial ultra sound examination performed by Dr. Litt on November 15th 1999.

There was no mention of any evidence of a separation of the placenta which would have caused her to have any bleeding, an abnormal location of the placenta, nor was there any mention of any abnormalities as far as the cervical length. That is, if you had shortening of the cervix, then there might be a possible risk of early labor, but there was no mention of any cervical shortening.

Q. Are you aware that Allyson claims that she is at high risk because she's had two ectopic pregnancies?

A. Yes.

Q. Is the fact of her ectopic, her two ectopic pregnancies, change her ability to travel in the second trimester?

A. Not in this case.

Q. Would you explain to the Court, please?

A. Yes. Her first ectopic pregnancy was in the left tube and it was treated by what we call a linear salpingostomy. That is, they opened the tube and removed the products of conception successfully. The tube was not removed.

With her second ectopic pregnancy it was in the same tube, but the tube was so badly damaged that it required removal of the tube, what we call a salpingectomy.

And one of the procedures that is frequently performed at the same time is called a cornual resection of the uterus.

Which mean[s] the removal of a small portion of the tube as it goes into the uterus itself. This is performed to help to prevent what we call cornual pregnancy, an actual pregnancy, in that section of the uterus with a possible later pregnancy. So it's done as a prophylactic procedure.

The fact that she had an intrauterine pregnancy, which was normal, both on November the 15th and again on December 16th, means that her previous history of ectopic pregnancy is of no consequence with this current pregnancy.

Q. Do you understand Allyson to be 40 years old?

A. Yes.

Q. Does that change her risk factor for travel?

A. No.

Q. You understand that Allyson alleges that she has epilepsy?

A. Yes.

Q. Have you reviewed her medical records with respect to her alleged epilepsy?

A. Yes.

Q. Would you tell the Court what your findings are, was there objective evidence of epilepsy?

A. There is no documented, objective evidence of a true epileptic disorder or convulsive disorder.

She gives as history of having had gran mal seizures, but none of this is documented by any physician.

She did have—there is a—there are reports in her records, one of a normal EEG, and this was back in 1988 or '89; a slightly abnormal EEG in 1989 which the report or non-specific changes that could be associated with a seizure disorder. But they are not—there's no conclusive evidence that this is associated with a seizure disorder.

She gives as history of having been on Dilantin during the 1980s but she discontinued this on her own, and by her report has had no seizures since that time.

There were reports of what we call mild chronic activity which, in 1989, at the time that she had her last known EEG, and at that particular time she was experiencing sleep deprivation and also severe stress. And by "myoclonic activity", we're talking about muscle jerks which is, sometimes some of us have experienced in going to sleep or with sleep deprivation that you can get that type of jerking activity. And this is what she reported.

And she was prescribed Depakote by a neurologist at that time, but she did not take the medication and did not follow up with his visits.

So to my knowledge and to any report in the records, which I reviewed, there are no reports of any seizure activity.

She has an unrestricted driver's license, and she has, obviously, traveled back and forth between Hawaii and the mainland without being on any type of medications. And, um, her age and her pregnancy do not offer any additional risk of seizure activity.

Q. Thank you. Would you (inaudible) Allyson to be an accurate historian with respect of her medical history?

A. No.

Q. What are the factors that prompt you to reach that conclusion?

A. She has failed to report, at least in the histories and physicals which I've reviewed, on various occasions she's failed to report a pregnancy termination in 1982, she has failed to report a herpes simplex virus infection, the initial date of which I do not know.

There is no mention from the neurologist, who did her EEG, that she had seizure activity, apparently, when she was on Quaalude and Placidyl which are substances, which can be abused, when she was in her 20s.

Q. What is Placidyl?

A. Placidyl is a sleep medication treated for insomnia.

Q. And what are Quaaludes?

A. Quaaludes are illegal drugs at this time. They were stimulated drugs.

Q. Now, Allyson had a laparoscopy performed by Dr. Inouye?

A. Correct.

Q. Would that have been under general anesthesia?

A. Yes.

Q. Did she disclose her epilepsy, alleged epilepsy—excuse me—to Dr. Inouye at that time?

A. There is no record in Dr. Inouye's records of any seizure disorder.

Q. Now, Allyson's affidavits allege diarrhea and vomiting as further precluding her from traveling.

Is there documentation of this complaint in any of (inaudible)?

A. No.

Q. Now, if Allyson's allegations of severe diarrhea and vomiting were true, would you expect her to seek treatment for such condition?

A. Yes.

Q. I have no further questions for this witness, Your Honor.

Faced with the conflicting testimony of Dr. Litt and Dr. Berry, the family court expressly subscribed to Dr. Berry's conclusion that traveling to Hawai'i for trial would not increase the risk of harm to either Allyson or her unborn child. Given the family court's consideration of the testimony of both doctors, we cannot say that the family court's crediting of Dr. Berry's testimony was an abuse of discretion inasmuch as it is axiomatic that reconciling conflicting testimony is beyond the scope of appellate review. *See State v. Martinez*, 101 Hawai'i 332, 340, 68 P.3d 606, 614 (2003) ("But '[i]t is well-settled that an appellate court will not pass upon issues dependent upon the credibility of witnesses and the weight of the evidence; this is the province of the trier of fact.' ") (Alteration in original.) (Citations omitted.); *State v. Mitchell*, 94 Hawai'i 388, 393, 15 P.3d 314, 319 (App.2000) ("The appellate court will neither reconcile conflicting evidence nor interfere with the decision of the trier of fact based on the witnesses' credibility or the weight of the evidence.") (Citation omitted.).

2. *February 15, 2000 motion to continue*

▪ Allyson filed a second motion to continue on November 15, 2000, which the family court orally denied at a February 17, 2000 hearing, as follows:

Without making a detailed set of findings at this point, I would, I guess, just summarize it by saying that, in looking at the status of this case, first of all, it's not in dispute. The parties have stipulated that Ms. Onaka is not today able to fly from Las Vegas to Maui, Hawaii because of her present medical condition and the fact that she is now considered to be at a point of having a high-risk pregnancy and in her seventh month.

I've also considered, of course, the fact that the defendant has been able to travel earlier from Las Vegas to Maui, Hawaii, at least up to or on or before the 20th of January of this year which was the previous date that was set for trial and she did not do so. That was the finding of [the pretrial judge] at the time of a hearing held on or about the 20th. I can't remember the exact date, but I'm really bound by it, but, I think, by that time, at least up to that point, she was able to travel and could have participated in a trial here on Maui.

I think I also have to consider the fact that the defendant has been, I guess, afforded an opportunity to provide testimonial evidence by way of deposition, either a regular deposition or even a video tape deposition, but never the less, a deposition, prior to the trial date back in December and since then, up until, I guess, today, really, but she has not done so.

And I think I have also considered and looked at the record in this case, and in looking at her responses to some of the discovery much earlier on in the year 1999, remarkably, I think, as [Clarence's counsel] has pointed out in her memorandum, but it's in the record in this case, really, since some of the things go back a way, she just can't remember a whole lot about some of what I consider to be, at least left for trial, material issues of fact here at trial. So I don't know, even if she were present, to what extent she would in fact be able to participate herself by giving testimony. I recognize there are other reasons why a party needs to be present. But that is a factor that is, also, I think,

worthy of recognition. And my conclusion that the trial should proceed is in recognition of the fact that both parties, the plaintiff and the defendant, do have due process rights to participate in their civil trial, which this is. And, looking at the rights of both the plaintiff and the defendant today and prior to today, this is a case that I have had to, essentially, balance those rights. And what I have concluded is, that in balancing those rights, the prejudice to Mrs. Onaka by not being present here on Maui during the trial, being able to assist her lawyers in participating in that trial, being able to, in a sense, confront any of the witnesses that would be called in this civil case, which is a slightly different right than a defendant in a criminal case would have, but, never the less, we recognize that parties do have the right to be present and confront the evidence in a civil proceeding. All of those rights at this time are outweighed by the rights of the plaintiff to proceed to have this matter resolved at this time. And in balancing those rights I, also, at this time, find there is a way to mitigate the prejudice to the defendant, and in doing so I would order that she be allowed to participate, if she chooses to do so, in consultation with her attorneys, by giving a deposition as scheduled and noticed by her attorneys, not by opposing attorneys, not by opposing counsel, provided that opposing counsel receive notice and are allowed to be present at such deposition.

It would be helpful to me if a deposition is so scheduled that it be a video deposition since the parties have indicated to me the credibility is an issue. And I think credibility is, to some extent, at least a little better on a video tape than it is by written transcript. And the right to schedule a deposition for Mrs. Onaka would be a right

that I would extend to her at any time during this trial—we're scheduled to complete this trial next week—but I would even allow a reasonable period of time at the conclusion of the evidentiary portion of the trial to schedule a deposition because I don't expect her counsel to, between now and whenever we finish next week, get up to Vegas, but I would give time after the conclusion of trial next week to do that. And, in talking about a reasonable time, I would say a period of at least up to 10 days, I think, would be reasonable. If you can convince me that more time is necessary, then I would consider it. But I intend to bring the evidentiary portion of this case to a conclusion as soon as possible so that we can get a ruling out also as soon as possible.

As noted by the family court, the parties stipulated that Allyson was no longer able to fly to Maui to attend trial due to her medical condition. A high-risk pregnancy would ordinarily constitute a legitimate basis for a continuance if it precluded a party from attending or participating in trial. To that end, in *Gaspar v. Kassm*, 493 F.2d 964, 969 (3d Cir.1974), the Third Circuit Court of Appeals stated as follows:

> It is customary to grant a continuance on the ground of illness of a party. We conclude that Kassm's testimony was necessary for the defense of his case, that the granting of a continuance would not have unduly prejudiced the other parties, and that the continuance motion was not motivated by procrastination, bad planning or bad faith on the part of Kassm or his counsel. It is the law that where none of the foregoing appear, the denial of a continuance for illness is abuse of discretion.

Other courts are generally in accord.[14] Nevertheless, we cannot conclude that the family

14. *See Latham v. Crofters, Inc.,* 492 F.2d 913, 915–16 (4th Cir.1974) (concluding that the trial court abused its discretion where, among other things, the motion for continuance was based upon "the intervening illness of a party" and the party's testimony was important to the case); *Davis v. Operation Amigo, Inc.,* 378 F.2d 101, 103 (10th Cir.1967) ("[W]e should observe that illness of a litigant severe enough to prevent him from appearing in court is always a legitimate ground for asking for a continuance. Even when the

judge has doubts about the existence of the claimed illness, the movant should be afforded an opportunity to substantiate his claim by proper proof."); *Cornwell v. Cornwell,* 118 F.2d 396, 398–99 (D.C.Cir.1941) ("Although the granting of a continuance or of motions for vacation of judgment and for new trial are addressed to the discretion of the trial court, that discretion must be exercised in the interest of justice. Where, as here, the appellant was ill and was the most

court abused its discretion inasmuch as the record indicates that Allyson falsely exaggerated the incapacitating effects of her pregnancy. Allyson must be precluded from perpetuating a fraud upon the court.

While arguing Allyson's February 15, 2000 motion to continue, Allyson's attorney represented to the family court as follows:

> So, the medical question is that she is preeclamptic, she cannot travel, she cannot be subjected to any stress, she can't do anything for the next—until her delivery, she can't, basically, do anything except remain in bed on her left side, getting up only to go to the bathroom, and for meals, that's it.

Despite the foregoing representation and the fact that she indeed did not attend trial, Allyson testified before the United States District Court for the District of Utah that she moved from Las Vegas, Nevada to Cedar City, Utah on February 28, 2000.[15] Her relocation fell within the precise period of time during which she claimed that she was essentially bed-ridden.

Allyson was also extended the courtesy of a post-trial deposition on March 6, 2000 to provide her with an opportunity to provide testimony, *de bene esse*. However, Allyson's attorney cancelled the March 6, 2000 post-trial deposition as follows:

> Pursuant to my conversations today with Ms. Onaka and her treating physician, Richard Litt, M.D., Ms. Onaka will *not* be able to have her videotaped testimony taken on March 6, 2000 in Las Vegas, Nevada because of the dangers such a procedure would create for Ms. Onaka and her baby.

(Emphasis in original.) She thus continued to rely upon her alleged incapacity while conveniently failing to disclose the fact of her travel—another activity that she claimed would pose an unacceptable risk of harm to her and her unborn child.

Allyson's falsity exposed, we perceive no abuse of discretion insofar as we cannot conclude that the family court "clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant." *Keahole Def. Coalition, Inc.*, 110 Hawai'i at 436, 134 P.3d at 602.

## C. Hawai'i Rules of Appellate Procedure Rule 28(b)(4)(iii)

We next take a moment to comment on the failure of the opening brief to comply with HRAP Rule 28(b)(4)(iii).

 Preliminarily, we note that

> "[t]he rule in this jurisdiction ... prohibits an appellant from complaining for the first time on appeal of error to which he has acquiesced or to which he failed to object." *Okuhara v. Broida*, 51 Haw. 253, 255, 456 P.2d 228, 230 (1969) (citations omitted); *see also* HRS § 641-2 (2004)

---

material witness in support of her own case, we conclude that the motions should have been granted.") (Footnotes omitted.); *Harrah v. Morgenthau*, 89 F.2d 863, 864 (D.C.Cir.1937) ("If there were anything in this record challenging the good faith of the motion for continuance, the professional ability or character or truthfulness of the physicians who made affidavit to the inability of Dunning to appear, or even if there were a showing that a continuance would have resulted in serious loss to the other parties, we should not now hesitate to sustain the action of the lower court; but here we are confronted with a case in which, as appears, the plaintiff was his only witness and was so seriously ill that his appearance in court would probably have resulted in his death. Insisting upon a trial in these circumstances must necessarily have resulted in prejudice to Dunning's rights."), *reh'g denied*, 89 F.2d 863 (1937); *Rausch v. Cozian*, 86 Colo. 389, 282 P. 251, 252 (1929); *Horr v. Easton*, 114 Neb. 829, 211 N.W. 172, 172–73 (1926); *Borman v. Geib*, 94 Okla. 270, 221 P. 1006, 1006–07 (1923);

*House v. Cardinal*, 69 Ind.App. 428, 122 N.E. 11, 12 (1919); *Mathews v. Willoughby*, 85 Ga. 289, 11 S.E. 620, 620 (1890).

15. Allyson does not dispute that she traveled from Nevada to Utah. Indeed, she does not even mention that fact in either her opening or reply briefs. The only conceivably related argument can be found in her reply brief, which asserts that "[t]he many references to matters that allegedly occurred in Allyson's bankruptcy case should be struck as that case is not part of the record." That is simply a misstatement of the law, inasmuch as it is settled that we may take judicial notice of the record in a related case. *See State v. Kido*, 109 Hawai'i 458, 461 n. 7, 128 P.3d 340, 344 n. 7 (2006) ("Although the fact of Kido's re-conviction does not appear in the record on appeal in the instant case, this court may take judicial notice of the records and files in Cr. No. 01-1-0265.").

("The appellate court ... need not consider a point that was not presented in the trial court in an appropriate manner."); *Craft v. Peebles*, 78 Hawai'i 287, 294, 893 P.2d 138, 145 (1995); Hawai'i Rules of Appellate Procedure (HRAP) Rule 28(b)(4)(iii) (2004) (noting that an appellant's opening brief shall state "where in the record the alleged error was objected to or the manner in which the alleged error was brought to the attention of the court or agency.").

There are sound reasons for the rule. It is unfair to the trial court to reverse on a ground that no one even suggested might be error. It is unfair to the opposing party, who might have met the argument not made below. Finally, it does not comport with the concept of orderly and efficient method of administration of justice.

*Kawamata Farms, Inc. v. United Agri Prods.*, 86 Hawai'i 214, 248, 948 P.2d 1055, 1089 (1997) (citation omitted).

*Querubin v. Thronas*, 107 Hawai'i 48, 61 n. 5, 109 P.3d 689, 702 n. 5 (2005) (ellipses in original) (citation omitted).

 Commensurate with the duty to object is the duty to identify where in the record that objection occurred. To that end, HRAP Rule 28(b)(4)(iii) (2002) requires that "[e]ach point shall state ... where in the record the alleged error was objected to or the manner in which the alleged error was brought to the attention of the court or agency." Here, Allyson has failed to indicate where in the record she objected to the actions of the family court from which she now takes exception.[16] The record before this court contains over seven thousand pages, contained within twenty-eight volumes. We have repeatedly warned that an appellate court will not sift through a voluminous record. *Kienker v. Bauer*, 110 Hawai'i 97, 104 n. 12, 129 P.3d 1125, 1132 n. 12 (2006) ("The appellate courts are not obligated to search the record to crystallize the parties' arguments."); *Lanai Co., Inc. v. Land Use*

*Comm'n*, 105 Hawai'i 296, 309 n. 31, 97 P.3d 372, 385 n. 31 (2004) ("This court is not obligated to sift through the voluminous record to verify an appellant's inadequately documented contentions."); *Miyamoto v. Lum*, 104 Hawai'i 1, 11 n. 14, 84 P.3d 509, 519 n. 14 (2004) ("None of the parties direct us to the April 1, 1999 report's location in the record on appeal, and we will not sift through ten volumes of records to find the report."). Additionally, we have stated that "[c]ounsel has no right to cast upon the court the burden of searching through a voluminous record to find the ground of an objection.... It is counsel's duty to cite accurately the portions of the record supporting counsel's position." *Int'l Bhd. of Elec. Workers, Local 1357 v. Hawai'ian Tel. Co.*, 68 Haw. 316, 323 n. 7, 713 P.2d 943, 950 n. 7 (1986).

Accordingly, we decline to canvas the record to verify whether Allyson appropriately preserved her points of error on appeal by making a timely objection to the challenged actions, and her appellate arguments are deemed waived. *See* HRAP Rule 28(b)(4) ("Points not presented in accordance with this section will be disregarded.").

## IV. CONCLUSION

Based upon the foregoing analysis, we conclude that Allyson's points of error are either without merit or have been waived. Therefore, we affirm the orders appealed from.

---

16. This defect is particularly unacceptable considering the fact that we previously struck Allyson's opening brief for failing to comply with HRAP Rules 32(a) and 32(b) (2002). We specifi-cally ordered her to filed an amended opening brief "that fully complies with the rules of appellate procedure."