CHERYL S. FERREIRA, now known as CHERYL S. MARSHALL, Plaintiff-Appellant,
v.
NELSON C. FERREIRA, Defendant-Appellee.
No. 28912.
Intermediate Court of Appeals of Hawaii.
November 18, 2009.
On the briefs:
Cheryl S. Ferreira, now, known as Cheryl S. Marshall, Plaintiff-Appellant pro se.
Nelson C. Ferreira, Defendant-Appellee pro se.

MEMORANDUM OPINION
FOLEY, Presiding J., FUJISE and LEONARD, JJ.
Plaintiff-Appellant pro se Cheryl S. Marshall, formerly Cheryl S. Ferreira, (Marshall) appeals from the (1) Post-Appeal Amended and Restated Decree Granting Absolute Divorce and Awarding Child Custody (Second Amended Decree) filed September 6, 2007; (2) Post[-]Appeal Findings of Fact and Conclusions of Law (Second Amended FOFs/COLs) filed September 6, 2007; and (3) "Order on Defendant's Motion for Reconsideration filed Sept. 17, 2007 and Plaintiff's Motion to Reconsider Post-Appeal Amended and Restated Decree Granting Divorce and Awarding Child Custody Filed Sept. 24, 2007" (Order Resolving Motions for Reconsideration) filed December 3, 2007 in the Family Court of the Second Circuit (family court).[1]
On appeal, Marshall argues:
(1) The family court incorrectly calculated the child support award. Related to this argument is Marshall's contention that in the February 10, 2004 Amended Findings of Fact and Conclusions of Law (Amended FOFs/COLs), part of Amended Finding of Fact (AFOF) 22 (AFOF 22) is clearly erroneous; in the Second Amended FOFs/COLs, part of FOF 23 (Second Amended FOF 23) is clearly erroneous; and part V.B. of the Second Amended Decree is clearly erroneous.
(2) The family court improperly calculated the spousal support award and failed to amend portions of its Amended FOFs/COLs regarding such, as ordered by this court in a related case, Ferreira v. Ferreira, 112 Hawai`i 225, 145 P.3d 768 (App. 2006). Related to this argument is Marshall's contention that parts of AFOF 61 and part VI. of the Second Amended Decree are clearly erroneous.
(3) The property division is grossly inequitable, where the family court made various mistakes and omissions in dividing the marital estate. Related to this argument is Marshall's contention that part VII.C. of the Second Amended Decree and AFOFs 21 and 44 and parts of AFOFs 48, 57, and 61 are clearly erroneous.

I. BACKGROUND
On May 15, 2003, trial commenced in the above matter. Ferreira, 112 Hawai`i at 226, 145 P.3d at 769. On February 10, 2004, the family court filed an Amended Decree Granting Absolute Divorce and Awarding Child Custody (Amended Decree) that purported to dissolve the marriage between Marshall and Nelson C. Ferreira (Ferreira) (Marshall and Ferreira are collectively referred to as "the parties"), award Marshall sole physical and legal custody of all five of the parties' children, award child support to Marshall, award alimony to Marshall in a total amount of $309,600, and divide and distribute the parties' property and debts.
Also on February 10, 2004, the family court filed its Amended FOFs/COLs, which provide in relevant part:
1. The parties were married on December 10, 1983 in Maui, Hawai`i.
2. An earlier Complaint for Divorce was previously filed in December 2000, in FC-D No.XX-X-XXXX.
3. The parties reconciled and that divorce action was dismissed.
4. The parties separated on August 27, 2001.
5. A second Complaint for Divorce, (the instant matter) was filed on November 9, 2001.
6. The marriage is irretrievably broken.
7. Three children were born to the parties during the marriage. They are: [Devin, Ashley, and Jaime].
8. Although [Stacey] . . . and [Kelly] . . . were born to the parties before the marriage, no issue exists as to paternity of said children.
9. Two of the parties' minor children . . . currently reside with [Marshall] at the marital residence, located at . . . Ekoa Place [(Ekoa Place residence)]. [Marshall] has been the primary care giver for the parties' five children and continues to be the primary care giver for [Devin and Ashley].
.....
12. The parties resided together before the marriage. [Marshall] worked as a waitress in 1975, an office clerk for one year from 1977-1978, a real estate agent for one year from 1980 to 1981, and provided day care in the marital home for 8 months in 1993. [Marshall] initially obtained a Real Estate Broker's license, which she permitted to expire. In August 1982 [Marshall] replaced her broker's license with Real Estate Sales Person's License . . . . That license was maintained and finally permitted to become delinquent in December 2002. The parties' putative marital and economic partnership began in 1975.
13. The real property located at [the Ekoa Place residence] was purchased with putative, marital partnership assets.
14. During the marriage, the parties purchased two more parcels of real property, . . . Alaneo Place [(Alaneo Place)] and Unit No. 415 at . . . Nohea Kai Drive, Maui Hawai`i [(Unit 415)].
15. The fair market value of the real property located at [the Ekoa Place residence] is $757,500, by stipulation of the parties, based in part upon appraisals of the property in its existing condition.
16. If this Court were to award [Marshall] an additional $43,000.00, as requested by [Marshall], to restore/repair/improve the [Ekoa Place residence] property, the property would be improved; it would be placed in different condition than it's [sic] appraised values, and it's [sic] value would be an unknown, higher amount. After the divorce [Marshall] through sale of assets and/or refinancing will have adequate monies to perform the repairs and improvements she desires. Moreover, she alone will receive the full benefit of such expenditures.
17. The parties stipulated that [Marshall] shall be awarded the marital residence, located at [the Ekoa Place residence]. The parties stipulate to use the mortgage value on May 14, 2003 of $23,819.31 and the net value is therefore $733,680.69.
18. [Ferreira] is employed as a realtor and owns the Kaanapali Resort Realty [(KRR)]. [KRR] is a solely held proprietorship, and [Ferreira] is the only realtor employed at [KRR].
19. [Ferreira] uses a portion of his residence at [Unit 415] as a home office. Ownership of that unit is integrally and inextricably related to [Ferreira's] ability to earn income at the levels indicated by the evidence herein.
20. [Ferreira] should be awarded the parties' interest in [Unit 415]. The parties stipulate to use the mortgage value on May 14, 2003 of $244,271.23 and the net value is $480,728.77.
21. The Court is unable to satisfactorily determine by a preponderance of the evidence the intrinsic value of [Ferreira's] business known as [KRR], and even if the Court were able to do so, there is no substantial evidence as to the impact its sale would have on [Ferreira's] future income.
22. The Court finds that [Ferreira] reported the following net[2] income on his Federal Schedule C's[3] for the following years:

 1992 $153,474
 1993 $ 10,459
 1994 $178,660
 1995 $ 25,710
 1996 $ 73,318
 1997 $401,979
 1998 $417,914
 1999 $251,355[4]
 2000 $144,930
 2001 $262,221

For 2002 through the first four months of 2003 [Ferreira's] income is $188,766. In 2003 up to the time of trial, [Ferreira] had gross earnings of approximately $84,000. These amounts include only [Ferreira's] reported business income and do not include interest, capital gains or other income, and the amounts are before self-employment and state and federal income taxes. The Court finds that the high income for years 1997 and 1998 is in part due to circumstances which will not occur again, in that the Developer of the Kaanapali Alii decided to sell off most of its remaining, owned units at the resort being in excess of 80 units.
After careful consideration and considering all the evidence in this case relating to [Ferreira's] income, the Court finds that averaging [Ferreira's] income for years 1999, 2000 and 2001 is a reasonable means of predicting [Ferreira's] future income for purposes of support.
23. The Court finds that $219,500 is a reasonable estimate of [Ferreira's] future net income from self-employment. One-half [Ferreira's] self-employment taxes would therefore be $8,167.55. For purposes of determining child support the Court further finds that the deduction from income on [Ferreira's] Schedule C for years 2001 and prior of $10,478 for depreciation of [Unit 415] should not be allowed, since the evidence manifestly indicates it is an appreciating asset. There is no actual reduction in value for wear and tear and such a deduction should not be permitted to reduce child support. The Court therefore finds that for purposes of determining child support [Ferreira's] annual, self-employed, net income before deductions for federal and state income taxes is $221,810.45.
24. [Marshall] remains unemployed, despite being ordered by the Honorable Eric Romanchak in June 2001, "to use diligent efforts to obtain employment." [Marshall] permitted her real estate salespersons license to become delinquent at the end of 2002. There is no evidence she has bothered to re-instate and activate this license or that she ever requested monies or assistance to do so.
25. No satisfactory reasons were provided by [Marshall] to justify her current unemployment and absence of any income, and the Court finds that [Marshall's] current unemployment is more a matter of desire and choice than lack of suitable employment skills or ability. Indeed, the Court is impressed that [Marshall] is intelligent, competent and capable.
26. [Ferreira] was ordered by the Honorable Eric Romanchak to pay to [Marshall] $3,000.00 per month as family support.
27. [Ferreira] has ultimately paid his court ordered family support for each and every month.
28. [Marshall] is entitled to child support for [Devin] . . . and [Ashley] . . ., and so long as she is living in [Marshall's] household and pursuing a full-time education, as provided herein, for [Jaime] . . ., based upon the respective income of the parties and the Child Support Guidelines [(CSG)].
29. Devin has been diagnosed as being in need of special educational and medical attention. Devin would benefit from receiving individual tutoring and may benefit from changing schools. Devin's special needs have cost [Marshall] to date $4,810.63. [Ferreira] should fully reimburse [Marshall] for said expenditures. The future reasonable costs for Devin's special needs shall be paid by [Ferreira] in addition to the child support determined pursuant to the [CSG]. Until further order of the Court said payment shall be $500 per month.
30. The Court finds that [Marshall] is currently capable of earning income in the amount of at least $2,000.00 per month and that amount should be imputed to her. But [Ferreira] has an earning ability far superior to [Marshall] and will continue to have a superior earning ability into the indefinite future.
. . . .
41. . . . The net value of the parties['] bank accounts at time of trial is $25,128.19.
42. The parties' retirement accounts . . . are marital property.
. . . .
The parties have stipulated that the above [retirement] accounts are to be divided equally[.]
43. [Ferreira] has sold units at the Kaanapali Resort condominium complex, almost exclusively since 1988.
44. The value of [Unit 415] is $725,000.00. The parties have stipulated to use the mortgage value on May 14, 2003 of $244,271.23 as the total encumbrance amount for said property. Therefore the net value is $480,728.77.
. . . .
46. . . . [T]he value of [Alaneo Place] is $399,000.00. The parties have stipulated to use the mortgage value on May 15, 2003 of $117,226.72 as the total encumbrance amount for said property. Therefore the net value is $258,773.28.
47. MISSING ASSETS. According to the testimony of expert [Kerr] and Exhibit 93, on October 13, 1998 [Ferreira] withdrew the following amounts:
FHB Acct. # . . . $182,544.54
FHB Acct. # . . . $62,029.95
Of these amounts [Kerr] and the bank statement for the account indicates that on the same date the following amount was deposited in the indicated account:
FHB Acct. # . . . $25,574.49
[Kerr] testified that this left $220,000 missing and unaccounted for.
. . . .
However, in the parties['] Stipulation regarding "Missing Assets," filed on December 17, 2003, the parties stipulated that the $220,000 is not a missing asset, and the Court so finds. According to [Kerr's] testimony and Exhibit 93, on October 13, 1998 [Ferreira] withdrew $35,000 from account . . . in the form of a cashiers['] check and the amount disappeared from the marital assets. In [Ferriera's] closing argument [Ferreira] protests that the amount was deposited "into account # . . . ." No bank statement or reference to a bank statement evidencing such a transaction was provided in evidence. The Court finds the deposit slip cryptic and unpersuasive. The Court reviewed the pertinent bank statement and was able to corroborate [Kerr's] testimony, but the Court is unable to locate any evidence confirming [Ferreira's] explanation. In the Affidavit of Defendant in Opposition to Plaintiff's Amended Motion for Reconsideration and in Further Support of Defendant's Motion for Reconsideration, filed December 15, 2003, a copy of a check, front and back, for $35,000 is included as an Exhibit. [Marshall] has not stipulated that this $35,000 is not missing or that this check was re-deposited. The copy of the check and the writings on it are unclear, difficult to read, and there is no indication whether they or any portion of them were ever admitted into evidence. Moreover, no bank statement showing and corroborating the deposit or re-deposit of said amount is provided. The Court, after reviewing the pertinent bank statements, finds that [Kerr's] testimony and Exhibit 93 remain[] credible and unsatisfactorily controverted, as to the above transaction and the Court must continue to conclude that the $35,000 was removed from the marital assets by [Ferreira].
. . . The court finds that small shortages indicated on Exhibit 93 may possibly be explained as cash for miscellaneous items during and for the marriage, and the Court cannot find by a preponderance of the evidence that such smaller, unexplained withdrawals are necessarily assets removed from the marital property and marital use.
However, larger items have no such simple explanation. The Court finds by a preponderance of the evidence that the following marital property was removed and its use and whereabouts are unexplained by [Ferreira] and therefore [Marshall] should be awarded one-half.
Referring to Exhibit 93 in evidence.

July 6, 1998 Kawahara Commission  $13,091.21
 unit 3-102 and 1-101
 $19,800.00, less deposit
 to First Haw Acct. . . .
 on July 17, 1998 of
 $6,708.79
September 8, 1998 FHB [account] cashiers['] $35,000.00
 check
October 13, 1998 BOH [account] withdrawal $6,505.45
 deposit shortage
March 14, 2000 Commission deposit $10,000.00
 shortage
May 3, 2000 Prudential referral fee $2,823.53
May 5, 2000 Deposit shortage $10,000.00
May 31, 2000 Commission Unit 4-902 $5,210.69
 deposit shortage
October 18, 2000 MBNA America refund $2,232.46
November 29, 2001 Lot 12 Commission $3,000.00
 shortage
Year 2000 Missing half of rental $28,522.73
 deposits
 Total Missing $116,386.07
 [Marshall's] one-half $58,193.04

48. MISSING INCOME. Based on the testimony of [Kerr], the evidence adduced and a review of the parties['] tax returns in evidence, the Court finds that in July 1998 commission income for two Kaanapali Alii condo sales by [Ferreira] is missing and unreported. But, so far as division of marital property is concerned, these amounts are included in the missing amounts discussed above. The Court finds by a preponderance of the evidence that in 2000 [Ferreira] failed to report rental and rental management income. Pursuant to Exhibit 30 in evidence, Analysis of 2000 rental income, the testimony of [Kerr] and the parties['] income tax returns, it appears there is reliable information from which to conclude by a preponderance of the evidence that gross rental income of $84,363.43 was unreported and diverted from the marital assets. Moreover, there is substantial evidence that this is net and not gross income to [Ferreira], based in part on the fact that the tax returns already show deductions for depreciation of [Unit 415] and because [Ferreira] is renting his own unit.
The Court therefore finds by a preponderance of the evidence that in 2000 [Ferreira] received $84,363.43 in unreported rental income for [Unit 415] and unreported rental management income, which was diverted from the marital assets. [Marshall's] one-half therefore equals $42,181.72.
The Court further finds by a preponderance of the evidence that [Ferreira] received additional rental income and rental management income for the year 2000 and other years, and that [Ferreira] failed to report any of the rental income he received on his state and federal income tax returns for the years in question in this matter. However, while the Court finds that rental income is being unreported, hidden and diverted, it is unable by a preponderance of the evidence to come to any reasonable determination of an amount for other years. [Kerr] made assumptions that it was reasonable to impute levels of income in other years, but the Court does not find that there is sufficient evidence to corroborate or to form an independent basis for concurring with such assumptions and reaching conclusions as to specific amounts. Moreover, in the future the Court is unable to find by a preponderance of the evidence that [Ferreira's] annual income, as determined by the Court herein, will be increased by renting [Unit 415], as it is unclear whether it may be more cost efficient to forgo rent and have unlimited access to potential real estate customers or to what extent it would be cost effective to do so. Moreover, to do so would require that [Ferreira] seek alternate housing at some additional, unknown expense. However, the Court does find that rental of [Unit 415] is available to [Ferreira] as a source of income, especially when sales are lagging.
49. The net value of the known marital estate at the time of trial after award of the vehicles, as set forth below, but excluding the value of the retirement accounts, which are also to be awarded as above stated, is determined to be $1,521,310.93. Therefore, [Marshall's] one-half share of the remaining marital estate is $760,655.47.
50. [Marshall's] marital share of the parties' retirement accounts is unknown, because no proof of the values on the stipulated dates was ever provided.
51. [Marshall] previously received [sic] $33,000.00 cash advance from the parties' retirement accounts, which was used to pay attorney[']s fees in this matter and for necessities of support. Based on the evidence, the Court finds this was necessitated by [Ferreira's] mismanagement of marital assets and cash flow. It is appropriate that [Ferreira] be solely responsible for all taxes resulting therefrom. At time of trial the total cash in the Bank of Hawaii savings and checking accounts is $25,128.19.
. . . .
53. Diverted, unreported and hidden assets and income are valid and relevant considerations, which would require this Court to deviate from Section 580-47, Hawaii Revised Statutes [(HRS)].

54. As above indicated, the Court finds that [Marshall] is entitled to an additional award of one-half the missing assets of $58,193.04 and one-half of the known missing rental income of $42,181.72. [Marshall] is therefore entitled to an award of the remaining assets in the amount of $861,030.22.
55. During the period of the divorce [Marshall] has reasonably incurred necessary debts to meet her needs and the needs of the children in the amount of $7,357.35. Moreover, [Marshall's] costs incurred to date for Devin's special educational testing and needs [is] in the amount of $4,810.63. It is equitable that those debts be paid from the marital estate, and therefore, that [Ferreira] pay one-half those debts from his share. The remaining amount to be awarded to [Marshall] is therefore increased to $867,114.21.
56. It is in all parties' best interests, including the children, for [Marshall] to become gainfully employed.
57. However, as a result of the property division in this divorce, [Marshall] will become financially independent and may never need to work or work full time.
58. [Marshall] was a licensed realtor-associate in the State of Hawaii and readily could have maintained her license in an active or inactive status. But in recent years she has not done any work, including in real estate, or sought to obtain any significant additional education or manifested any serious interest in doing so, apart from the prompting of counsel pursuant to this divorce. This is true even though the divorce has been going on and off for several years, and [Marshall] has been unhappily dependent on [Ferreira] for all monies for necessary expenses. There is no evidence that [Marshall] has ever requested [Ferreira] or the Court to order [Ferreira] to provide pre-decree funds for her education or pre-decree funds to assist her in maintaining or securing an active real estate license. The Court is not satisfied by a preponderance of the evidence that [Marshall] will decide to become gainfully employed or further her education. It has long been true that [Marshall] could readily work as a realtor salesperson, but she prefers not to do so.
59. Upon divorce and division of the property there will be limited cash and accessible liquid assets available to [Marshall] for several months, depending upon the time it takes to liquidate [Alaneo Place].
60. It is fair and reasonable to require [Ferreira] to make monthly cash payments for a fixed period in the form of alimony to provide [Marshall] with cash in the initial period following the divorce, to reimburse [Marshall] for incurred debts, as indicated above, and to give her some opportunity to seek additional education and employment.
61. The income imputed to [Marshall] is $2,000. Upon divorce [Marshall's] net worth will be in excess of $950,000. [Marshall] will have the ability to substantially restructure her assets and debt, as she wishes, to place a substantial portion in liquid form. Taking judicial notice that the interest rate on 30 year treasury bills at the time of this decree is approximately 5%, it is reasonable to expect and impute earnings and appreciation on [Marshall's] total net assets of approximately $47,000 per year over the long term, or approximately $3,900/month. There are many possible options available to [Marshall] to access or defer access and use of such appreciation and income. Combined with her imputed earnings, [Marshall] should be able to average, over the long term, income and/or appreciation of approximately $5,900 per month. Clearly a portion of this appreciation will be tied up in her residence and possibly in other real property. But the allocation, the immediacy of access and the extent of deferral is largely up to [Marshall]. It is fair and reasonable that in addition to child support [Ferreria] pay to [Marshall] $4,300 per month for a period of six years to at least provide [Marshall] with the opportunity to further her education and improve her employment skills and to provide her with an opportunity to continue her lifestyle on an approximately equal basis with [Ferreira], given his earning power and assets, hidden or otherwise, and his obligations hereunder, and to have the assistance ended soon enough to motivate [Marshall] to take appropriate steps to improve her earning power. Due to the manifest communication difficulties between the parties it is fair and just that, a portion of same shall be advanced in the form of a lump sum payment upon the closing of the sale of [Alaneo Place], as provided in the Decree herein.
. . . .
65. [Ferreria's] manifest failure to report and disclose income and assets, his evident intent to divert and conceal marital assets, and the suspicious nature of numerous transactions relating to income and movement of assets, justified and created the necessity for [Marshall] to engage in a detailed and extensive investigation and preparation for this hearing, including retaining of attorneys and experts.
CONCLUSIONS OF LAW
. . . .
5. §580-47(a) of the [HRS] and the Hawaii [CSG] permit this Court to require [Ferreira] to pay child support for the three children of the parties residing at home, one of whom is an adult under the age of 23 attending an institute of higher education full-time. Moreover, [Ferreira] is agreeable to doing so.
6. The Court concludes that [Ferreira's] child support should be determined by using the CSG with a deemed annual net income for [Ferreira] of $221,810.45, before state and federal taxes, but after deduction of one-half self-employment tax and after adjustment for unacceptable depreciation deductions. [Marshall's] gross monthly income is imputed to be $2,000.00.
7. The Court may impute reasonable income to [Marshall]. Saromines v. Saromines, 3 Haw. App. 20 (1982).
(Format altered; emphases in original.)
Marshall appealed, and this court concluded "that although the Amended Decree [was] final and appealable with respect to the dissolution of the marriage and spousal support, it [was] not a final and appealable decree with respect to child custody, visitation, and support or the division and distribution of property and debts," Ferreira, 112 Hawai`i at 229, 145 P.3d at 772, because (1) the Amended Decree appeared to leave the determination of the child support amount to the Child Support Enforcement Agency (CSEA), which was improper,[5] id.; (2) in dividing the marital property, the family court awarded Marshall $760,655.47 without finding "all of the ingredient values" or "list[ing] the assets to which those ingredient values relate," id.; (3) the Amended Decree did not explain how Ferreira was to pay Marshall $861,030.22 in assets awarded to her or, if the $861,030.22 included the value of the Ekoa Place residence, how Marshall would receive the $127,349.53 balance due, id. at 230, 145 P.3d at 773; and (4) the family court erred by ordering Ferreira to pay Marshall a lump sum alimony payment "equal to the amount that the net proceeds of the sale of [Alaneo Place] exceeds $127,349.53" because (a) Alaneo Place was marital property, the net proceeds of which were to be divided and distributed between the parties, and Ferreira was prohibited from using any net proceeds of the sale of that property to partially satisfy his alimony obligation to Marshall and (b) nothing was said regarding the distribution of the $127,349.53. Id.
In a footnote in Ferreira, this court stated:
AFOF No. 17 [of the Amended Decree] finds that the net value of [the Ekoa Place residence] is $733,680.69. That $733,680.69 appears to be included in [Marshall's] $950,000+ net worth. The court did not explain how [Marshall] can maintain a residence for herself and the children while making income from the $733,680.69 net value of the . . Ekoa Place residence or its appreciation, if any.
Id. at 230 n.6, 145 P.3d at 773 n.6.
This court vacated the spousal support part of the Amended Decree and remanded that part for reconsideration. Id. at 231, 145 P.3d at 774.
On September 6, 2007, the family court entered its Second Amended Decree, which reiterated the dissolution of the marriage between Marshall and Ferreira; awarded Marshall sole physical and legal custody of the minor children, plus monthly child support in the amount of $3,310; awarded a total of $309,600 in spousal support to Marshall, but did not order that Ferreira pay a portion of that amount to Marshall in a lump sum; and divided and distributed Marshall and Ferreira's property and debts, including an award to Marshall of $760,655.47. In part VII.C., the family court listed the ingredient values of the $760,655.47 and the assets to which the ingredient values related. The family court amended its equalization award to include higher missing asset amounts and higher missing income amounts, resulting in a higher overall award to Marshall of the remaining assets in the amount of $961,404.97, replacing the $861,030.22 awarded to her in the Amended Decree. The family court did not explain how Ferreira was to pay Marshall the $961,404.97.
Also on September 6, 2007, the family court filed its Second Amended FOFs/COLs, which provide in relevant part:
POST-APPEAL AMENDMENTS TO AMENDED FINDINGS OF FACT
The following Amended Findings of Fact are hereby further amended to provide as follows, the remaining Amended Findings of Fact entered on February 10, 2004 remain unchanged:
23. This Finding of Fact is amended to provide that for purposes of child support calculations in accordance with the [CSG], Defendant's gross income after deducting reasonable expenses is deemed to be $221,810.45.
24. As of February 10, 2004, [Marshall] remains unemployed, despite being ordered by the Honorable Eric Romanchak in June 2001, "to use diligent efforts to obtain employment." (Pursuant to an earlier Complaint for Divorce filed in December 2000, in FC-D No. 00-1-0148.) Moreover, [Marshall] permitted her real estate salespersons license to become delinquent at the end of 2002. There is no evidence she has bothered to re-instate and activate this license or that she ever requested monies or assistance to do so.
53. Diverted, unreported and hidden assets and income are valid and relevant considerations, which would require this Court to deviate from Section 580-47, [HRS]. (See also Sands v. Sands, 482 N.W.2d 203 (1992).)
54. The Court further finds that the evidence is clear and convincing that the following amounts are missing:
 Missing Assets: $116,386.07
 Missing Income: $84,363.43
The Court hereby finds that [Marshall] is entitled to an additional award of the entire, known missing assets of $116,386.08 and the entire, known missing rental income of $84,363.44. [Marshall] is therefore entitled to an award of the remaining assets in the amount of $961,404.97.
55. During the period of the divorce [Marshall] has reasonably incurred necessary debts to meet her needs and the needs of the children in the amount of $7,357.35. Moreover, [Marshall's] costs incurred to date for Devin's special educational testing and needs [is] in the amount of $4,810.63. It is equitable that those debts be paid from the marital estate, and therefore, that [Ferreira] pay one-half those debts from his share. The remaining amount to be awarded to [Marshall] is therefore increased to $967,488.96.
(Emphases in original.)
Ferreira filed a motion to reconsider the Second Amended Decree (Ferreira's Motion to Reconsider), to which Marshall filed a memorandum in opposition. Marshall also filed a motion for reconsideration (Marshall's Motion for Reconsideration), to which Ferreira filed a memorandum in opposition. On December 3, 2007, the family court filed the Order Resolving Motions for Reconsideration.

II. STANDARDS OF REVIEW

A. Family Court Decisions
Generally, the family court possesses wide discretion in making its decisions and those decisions will not be set aside unless there is a manifest abuse of discretion. Thus, [an appellate court] will not disturb the family court's decisions on appeal unless the family court disregarded rules or principles of law or practice to the substantial detriment of a party litigant and its decision clearly exceeded the bounds of reason.
Fisher v. Fisher, 111 Hawai`i 41, 46, 137 P.3d 355, 360 (2006) (quoting In re Doe, 95 Hawai`i 183, 189-90, 20 P.3d 616, 622-23 (2001)).

B. Partnership Model Division
The Partnership Model requires the family court, when deciding the division and distribution of the Marital Partnership Property of the parties['] part of divorce cases, to proceed as follows: (1) find the relevant facts; start at the Partnership Model Division and (2)(a) decide whether or not the facts present any valid and relevant considerations authorizing a deviation from the Partnership Model Division and, if so, (b) itemize those considerations; if the answer to question (2)(a) is "yes," exercise its discretion and (3) decide whether or not there will be a deviation; and, if the answer to question (3) is "yes," exercise its discretion and (4) decide the extent of the deviation.
Question (2)(a) is a question of law. The family court's answer to it is reviewed under the right/wrong standard of [appellate] review. Questions (3) and (4) are discretionary matters. The family court's answers to them are reviewed under the abuse of discretion standard of appellate review.

Jackson v. Jackson, 84 Hawai`i 319, 332-33, 933 P.2d 1353, 1366-67 (App. 1997) (footnote omitted).
Schiller v. Schiller, 120 Hawai`i 283, 287-88, 205 P.3d 548, 552-53 (App. 2009).

C. Credibility of Witnesses
[I]t is axiomatic that reconciling conflicting testimony is beyond the scope of appellate review. See State v. Martinez, 101 Hawai`i 332, 340, 68 P.3d 606, 614 (2003) ("But `[i]t is well-settled that an appellate court will not pass upon issues dependent upon the credibility of witnesses and the weight of the evidence; this is the province of the trier of fact.'") . . .; State v. Mitchell, 94 Hawai`i 388, 393, 15 P.3d 314, 319 (App. 2000) ("The appellate court will neither reconcile conflicting evidence nor interfere with the decision of the trier of fact based on the witnesses' credibility or the weight of the evidence.").
Onaka v. Onaka, 112 Hawai`i 374, 384, 146 P.3d 89, 99 (2006).

D. Motion for Reconsideration
The purpose of a motion for reconsideration is to allow the parties to present new evidence and/or arguments that could not have been presented during the earlier adjudicated motion. Reconsideration is not a device to relitigate old matters or to raise arguments or evidence that could and should have been brought during the earlier proceeding. We review a trial court's ruling on a motion for reconsideration under the abuse of discretion standard. An abuse of discretion occurs if the trial court has clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant.
Taqupa v. Taqupa, 108 Hawai`i 459, 465, 121 P.3d 924, 930 (App. 2005) (internal quotation marks, citations, ellipsis, and brackets omitted).

E. Findings of Fact
"[F0Fs] are reviewed under the clearly erroneous standard. A[n FOF] is clearly erroneous when (1) the record lacks substantial evidence to support the finding or determination, or (2) despite substantial evidence to support the finding or determination, the appellate court is left with the definite and firm conviction that a mistake has been made." Schiller, 120 Hawai`i at 288, 205 P.3d at 553 (internal quotation marks and citations omitted).

F. Conclusions of Law
A COL is not binding upon an appellate court and is freely reviewable for its correctness. [An appellate] court ordinarily reviews COLs under the right/wrong standard. Thus, a COL that is supported by the trial court's FOFs and that reflects an application of the correct rule of law will not be overturned. However, a COL that presents mixed questions of fact and law is reviewed under the clearly erroneous standard because the court's conclusions are dependent upon the facts and circumstances of each individual case.

Chun v. Bd. of Trs. of Employees' Ret. Sys. of the State of Hawai`i, 106 Hawai`i 416, 430, 106 P.3d 339, 353 (2005) (internal quotation marks, citations, and brackets in original omitted) (quoting Allstate Ins. Co. v. Ponce, 105 Hawai`i 445, 453, 99 P.3d 96, 104 (2004)).
Schiller, 120 Hawai`i at 288, 205 P.3d at 553.

G. Child Support
Since no rules or guidelines have been published advising the family court how to decide a certain child support issue, the relevant appellate standard of review is the abuse of discretion standard. An abuse of discretion occurs if the trial court has clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant.

Clark[, 110 Hawai`i at 465, 134 P.3d at 631] (internal quotation marks, citation, and brackets omitted).
Doe v. Doe, 118 Hawai`i 268, 278, 188 P.3d 782, 792 (App. 2008), cert. rejected, 2008 WL 4891678 (Nov. 14, 2008).

H. Plain Error
Hawaii Rules of Appellate Procedure (HRAP) Rule 28(b)(4) provides that "[p]oints not presented in accordance with [HRAP Rule 28(b)] will be disregarded, except that the appellate court, at its option, may notice a plain error not presented."
The Hawaii Supreme Court in Okada Trucking Co., Ltd., v. Bd. of Water Supply, 97 Hawai`i 450, 40 P.3d 73 (2002), stated that
the plain error doctrine represents a departure from the normal rules of waiver that govern appellate review, and, as such, . . . an appellate court should invoke the plain error doctrine in civil cases only when justice so requires. As such, the appellate court's discretion to address plain error is always to be exercised sparingly. And, indeed, in civil cases, we have taken three factors into account in deciding whether our discretionary power to notice plain error ought to be exercised: (1) whether consideration of the issue not raised at trial requires additional facts; (2) whether its resolution will affect the integrity of the trial court's findings of fact; and (3) whether the issue is of great public import.
Id. at 458, 40 P.3d at 81 (block quotation format altered; internal quotation marks, citations, brackets, and ellipsis omitted).

I. Property Division
"We review the family court's final division and distribution of the estate of the parties under the abuse of discretion standard, in view of the factors set forth in HRS § 580-47 and partnership principles." Tougas v. Tougas, 76 Hawai`i 19, 26, 868 P.2d 437, 444 (1994) (internal quotation marks, citation, and footnote omitted).

III. DISCUSSION
In Prell v. Silverstein, 114 Hawai`i 286, 291-93, 162 P.3d 2, 7-9 (App. 2007), this court set forth the following general principles governing divorce actions:
HRS § 580-47 (2006 Repl.) provides . . in relevant part, as follows:
Support orders; division of property. (a) Upon granting a divorce, or thereafter if, in addition to the powers granted in subsections (c) and (d), jurisdiction of those matters is reserved under the decree by agreement of both parties or by order of court after finding that good cause exists, the court may make any further orders as shall appear just and equitable (1) compelling the parties or either of them to provide for the support, maintenance, and education of the children of the parties; (2) compelling either party to provide for the support and maintenance of the other party; (3) finally dividing and distributing the estate of the parties, real, personal, or mixed, whether community, joint, or separate; and (4) allocating, as between the parties, the responsibility for the payment of the debts of the parties whether community, joint, or separate, and the attorney's fees, costs, and expenses incurred by each party by reason of the divorce. In making these further orders, the court shall take into consideration: the respective merits of the parties, the relative abilities of the parties, the condition in which each party will be left by the divorce, the burdens imposed upon either party for the benefit of the children of the parties, and all other circumstances of the case. In establishing the amounts of child support, the court shall use the guidelines established under [HRS §1 576D-7. Provision may be made for the support, maintenance, and education of an adult or minor child and for the support, maintenance, and education of an incompetent adult child whether or not the petition is made before or after the child has attained the age of majority.
In addition to any other relevant factors considered, the court, in ordering spousal support and maintenance, shall consider the following factors:
(1) Financial resources of the parties;
(2) Ability of the party seeking support and maintenance to meet his or her needs independently;
(3) Duration of the marriage;
(4) Standard of living established during the marriage;
(5) Age of the parties;
(6) Physical and emotional condition of the parties;
(7) Usual occupation of the parties during the marriage;
(8) Vocational skills and employability of the party seeking support and maintenance;
(9) Needs of the parties;
(10) Custodial and child support responsibilities;
(11) Ability of the party from whom support and maintenance is sought to meet his or her own needs while meeting the needs of the party seeking support and maintenance;
(12) Other factors which measure the financial condition in which the parties will be left as the result of the action under which the determination of maintenance is made; and
(13) Probable duration of the need of the party seeking support and maintenance.
. . . .
(b) An order as to the custody, management, and division of property and as to the payment of debts and the attorney's fees, costs and expenses incurred in the divorce shall be final and conclusive as to both parties subject only to appeal as in civil cases. The court shall at all times, including during the pendency of any appeal, have the power to grant any and all orders that may be necessary to protect and provide for the support and maintenance of the parties and any children of the parties to secure justice, to compel either party to advance reasonable amounts for the expenses of the appeal including attorney's fees to be incurred by the other party, and to amend and revise such orders from time to time.
The Hawai`i Supreme Court has stated that the foregoing statute confers "wide discretion upon the family court." Gussin v. Gussin, 73 Haw. 470, 479, 836 P.2d 484, 489 (1992). However,
in adjudicating the rights of parties to a divorce, the family court strives for a certain degree of uniformity, stability, clarity or predictability in its decision-making and thus [family court judges] are compelled to apply the appropriate law to the facts of each case and be guided by reason and conscience to attain a just result. The partnership model is the appropriate law for the family courts to apply when exercising their discretion in the adjudication of property division in divorce proceedings.
[Tougas, 76 Hawai`i at 28, 868 P.2d at 446] (citations, internal quotation marks, and brackets omitted).

A. Spousal Support Award
Marshall contends the family court improperly calculated the spousal support award. Related to this argument is Marshall's contention that AFOF 61 is clearly erroneous.

1. Standard of Living
Marshall contends the family court's alimony award is grossly inequitable because it provides for a "severe reduction [from her] pre-divorce standard of living while [Ferreira] will go on to enjoy a far more expanded standard of living then [sic] the one he enjoyed during the marriage." She cites to a number of cases outside of this jurisdiction and secondary sources in support of this argument, but she does not explain what her pre-divorce standard of living was.
Part VI. of the Second Amended Decree includes a table (alternatively, Post-Divorce Income Table or the Table) comparing Ferreira's post-divorce monthly net income after divorce costs and Marshall's post-divorce monthly income, to show that while Marshall received alimony payments, her post-divorce monthly income would be roughly equal to Ferreira's post-divorce monthly net income:

 [Ferreira's] Monthly Net Income $18,484.20
 Less
 Child Support $3,310.00
 Devin $500.00
 Alimony $4,300.00
 [Ferreira's] Monthly Net after $10,374.20
 Divorce costs
 [Marshall's] monthly net income
 Imputed Income $2,000.00
 Estimated Appreciation $3,900.00
 [Alimony] $4,300.00
 [Marshall's] post-divorce $10,200.00
 monthly income

(Emphases added.)
AFOF 61 provides that "[i]t is fair and reasonable that in addition to child support [Ferreira] pay to [Marshall] $4,300 per month for a period of six years to at least provide [Marshall] with the opportunity to further her education and improve her employment skills and to provide her with an opportunity to continue her lifestyle on an approximately equal basis with [Ferreira] . . . ."
In this case, the family court apparently awarded Marshall rehabilitative periodic alimony. See In re Marriage of Becker, 756 N.W.2d 822, 826 (Iowa 2008) (internal quotation marks and citation omitted) (stating that rehabilitative alimony is "a way of supporting an economically dependent spouse through a limited period of re-education or retraining following divorce, thereby creating incentive and opportunity for that spouse to become self-supporting"); Lindberg v. Lindberg, 770 N.W.2d 252, 267-68 (N.D. 2009) (citation omitted) (stating that "rehabilitative awards are typically limited in duration and are designed to afford disadvantaged spouses the opportunity to gain the education, training, and experience necessary to become self-sufficient"); Hults v. Hults, 11 So. 3d 1273, 1280 (Miss. App. 2009) (internal quotation marks and citation omitted) (stating that "[r]ehabilitative alimony is awarded to parties who have put their career on hold while taking care of the marital home" and "allows the party to get back into the working world in order to become self-sufficient").
In Cassiday v. Cassiday, 6 Haw. App. 207, 215, 716 P.2d 1145, 1151 (1985), this court stated the following:
When deciding in a divorce case whether one party must pay periodic spousal support to the other, for how long, and how much, the family court must consider all of the factors enumerated in HRS § 580-47(a) (Supp. 1984). Generally, however, the most relevant factual questions are sequentially as follows:
1. Taking into account the property awarded in the divorce case to the party seeking spousal support, what amount, if any, does he or she need to maintain the standard of living established during the marriage? See HRS § 580-47(a) (Supp. 1984). If there is no need for spousal support, then there is no obligation to pay.
2. Taking into account the income of the party seeking spousal support, or what it should be, and the income producing capability of the property awarded to him or her in the divorce action, what is his or her ability to meet his or her need independently? See HRS § 580-47(a) (Supp. 1984). If the party seeking spousal support can satisfy his or her need independently, then there is no obligation to pay.
3. Taking into account the income of the party from whom spousal support is sought, or what it should be, and the income producing capability of the property awarded to him or her in the divorce action, what is his or her ability to meet his or her own need while meeting the need for spousal support of the party seeking spousal support? See HRS § 580-47(a) (11) (Supp. 1984).
Id. at 215, 716 P.3d at 1151 (footnote omitted).
The first consideration in Cassiday is "[t]aking into account the property awarded in the divorce case to the party seeking spousal support, what amount, if any, does he or she need to maintain the standard of living established during the marriage?" Id. (emphasis added). At trial, Marshall testified that she would need $6,093.62 per month to cover personal expenses alone, to maintain her standard of living at the time of reconciliation "and previous." Yet, nowhere in the Amended FOFs/COLs, Second Amended Decree, or Second Amended FOFs/COLs does the family court state the amount of alimony Marshall would need to maintain the standard of living established during the marriage. This was an abuse of discretion.

2. Ferreira Dicta
Marshall argues that the family court failed to amend its AFOF 17, according to this court's dicta in footnote six in Ferreira. She adds that the Ekoa Place residence is a liability, not an income producing asset.
AFOF 17 provides that the marital Ekoa Place residence shall be awarded to Marshall, and the property's net value is $733,680.69. Part VII.C. of the Amended Decree provides:
C. After award of the vehicles, as above-stated, and an adjustment of one-half of the $10,250.00 for the Harley, to be added to [Marshall's] share to equalize the unequal division of the autos and an award of the retirement accounts, as above stated, [Marshall] remains entitled to an award of $760,655.47. This includes one-half of the bank accounts ($25,128.19/2=$12,564.10)
(Emphasis in original.) The family court then went on to grant Marshall an equalization award, including one half of the $58,193.04 in missing assets and one half of $42,181.72 in known missing rental income, resulting in an award to Marshall of $861,030.22 in remaining assets. The family court added to that Ferreira's one-half share of costs Marshall reasonably incurred to meet her needs and the needs of the children during the "period of the divorce," or $6,083.99, resulting in a total award to Marshall of $867,114.21 in remaining assets.
AFOF 61 provides in relevant part:
61. The income imputed to [Marshall] is $2,000. Upon divorce [Marshall's] net worth will be in excess of $950,000. [Marshall] will have the ability to substantially restructure her assets and debt, as she wishes, to place a substantial portion in liquid form. Taking judicial notice that the interest rate on 30 year treasury bills at the time of this decree is approximately 5%, it is reasonable to expect and impute earnings and appreciation on [Marshall's] total net assets of approximately $47,000 per year over the long term, or approximately $3,900/month. There are many possible options available to [Marshall] to access or defer access and use of such appreciation and income. Combined with her imputed earnings, [Marshall] should be able to average, over the long term, income and/or appreciation of approximately $5,900 per month. Clearly a portion of this appreciation will be tied up in her residence and possibly in other real property. But the allocation, the immediacy of access and the extent of deferral is largely up to [Marshall]. It is fair and reasonable that in addition to child support [Ferreira] pay to [Marshall] $4,300 per month for a period of six years . . . .
On appeal, this court stated in footnote six:
AFOF No. 17 finds that the net value of [the Ekoa Place residence] is $733,680.69. The $733,680.69 appears to be included in [Marshall's] $950,000+ net worth. The court did not explain how [Marshall] can maintain a residence for herself and the children while making income from the $733,680.69 net value of the . . . Ekoa Place residence or its appreciation, if any.
Ferreira, 112 Hawai`i at 230 n.6, 145 P.3d at 773 n.6.
On remand, the family amended part VII.C. of the Amended Decree to read:
C. After award of the vehicles, as above-stated, and an adjustment of one-half of the $10,250.00 for the Harley, to be added to [Marshall's] share to equalize the unequal division of the autos and an award of the retirement accounts, as above stated, [Marshall] remains entitled to an award of $760,655.47. This is arrived at as follows:[6]

 FOF #
 Net Value of [Ekoa Place $733,680.69 17
 residence
 Net Value of [Unit 415] $480,728.77 44
 Net Value of [Alaneo Place] $258,773.28 46
 Harley $ 10,285.00 52
 Bank Accounts $25,128.19 51
 Total $1,521,310.93
 /2
 [Marshall's] Share = $760,655.47

(Emphasis in original.)
As it now stands, the family court's finding that Marshall's net worth will be in excess of $950,000 is based in part on the court's award of one-half of the value of the Ekoa Place residence. Given that the family court awarded Marshall the Ekoa Place residence "as her solely held property," the court clearly erred by also awarding Marshall one-half the value of the property. Part VII.C. of the Second Amended Decree is clearly erroneous. On remand, the family court may grant Marshall either the net value of the Ekoa Place residence or one-half the value of the Ekoa Place residence, but not both.
AFOF 61 states that Marshall will have "the ability to substantially restructure her assets and debt, as she wishes, to place a substantial portion in liquid form"; "[t]here are many possible options available to [Marshall] to access or defer access and use of such appreciation and income [she will earn on her total net assets]"; and "[c]learly a portion of this appreciation will be tied up in her residence and possibly in other real property. But the allocation, the immediacy of access and the extent of deferral is largely up to [Marshall]." At trial, on cross-examination, Ferreira's attorney asked Marshall if she had "explored the possibility of selling [the Ekoa Place residence] [a four-bedroom home] and taking the equity from the sale and using that to purchase a smaller home" for her and her two children still living with her. However, in AFOF 61, the family court does not explicitly state that it expected Marshall to sell the Ekoa Place residence to provide herself with more liquidity. Therefore, the family court still has not "explain[ed] how [Marshall] can maintain a residence for herself and the children while making income from the $733,680.69 net value of the . . . Ekoa Place residence or its appreciation, if any." Ferreira, 112 Hawai`i at 230 n.6, 145 P.3d at 773 n.6. This was an abuse of discretion.

3. $3,900 Imputed Income
Marshall contends the family court's imputed earnings of $3,900 per month to her is erroneous. In AFOF 61, the family court found that "[t]aking judicial notice that the interest rate on 30 year treasury bills at the time of this decree is approximately 5%, it is reasonable to expect and impute earnings and appreciation on [Marshall's] total net assets of approximately $47,000 per year over the long term, or approximately $3,900/month."
In support of her argument, Marshall cites to a position statement she filed on August 28, 2006 (the 8/28/06 position statement), in which she argued the following:
(c) Imputed Earnings  [The family court] imputed earnings of $3,900 per month to [Marshall] on long-term investments at 5% that together with [Marshall's] imputed earning potential of $2,000 from employment [the family court] found [Marshall] should be able to average "over the "long term" [sic] income and appreciation of approximately $5,900 per month (gross). [Marshall] received $97,387 in IRA funds. These funds will not be available to [Marshall] until she is 65 years of age in 18 years. At [Marshall's] age she cannot risk losing her principle [sic] and must invest in low income no risk investments that will protect her principle [sic]. These funds invested at 5% over 18 years will increase the principle [sic] to approximately $185,000. Note: [the family court] found [Ferreira] earns more than this amount in one year. If [Marshall] were to continue to invest her principle [sic] at 5% these funds would generate $9,250 in gross annual income of $770.00 per month that is subject to taxes. Furthermore, [the family court] failed to consider that income from employment and income from long-term investments will not be received at the same time. At age 65 [Marshall] will undoubtedly be retired and will not be generating income from employment.
(Emphasis in heading in original.)
It is unclear if in AFOF 61, the family court meant to suggest that Marshall liquidate the real property awarded to her and invest the resulting moneys, along with the cash assets she had been awarded outright, in interest-bearing accounts to use for her support. Regardless, it was error for the family court to take judicial notice that a United States Treasury Bill (T-Bill) with a maturity of 30 days yielded 5% interest per year at the time the Amended FOFs/COLs were filed, when the court did not order and could not have ordered Marshall to invest any of the assets awarded to her specifically in a T-Bill and there was no evidence to support an assumption that the 30-day T-Bill rate would remain at 5%. Last, the family court could not reasonably have concluded that Marshall could both support herself with the assets awarded to her  and in the case of the Ekoa Place residence, live in the residence awarded to her  and make income from them. Given the foregoing, the finding is clearly erroneous and the imputation of $3,900 income per month to Marshall, an abuse of discretion.

4. Ferreira's Income
Marshall argues that in calculating the alimony award, the family court grossly undervalued Ferreira's monthly income by relying on income amounts reported by Ferreira on his 1999, 2000, and 2001 federal tax returns. Related to this point is Marshall's contention that the following part of AFOF 22 is clearly erroneous: "[T]he Court finds that averaging [Ferreira's] income for years 1999, 2000 and 2001 is a reasonable means of predicting [Ferreira's] future income for purposes of support."
In the Second Amended Decree, the family court based its alimony award in part on its determination that Ferreira's future annual income was $18,484.20 per month. In the Amended Decree, the family court had based its alimony award on a yearly income of $221,810.45. That figure was derived by averaging Ferreira's reported annual income for the years 1999, 2000, and 2001; adding to the resulting amount the value of an improper deduction Ferreira had reported on his 2001 federal tax return; and subtracting from that amount the equivalent of one-half of Ferreira's self-employment taxes.
To support this argument, Marshall cites to the 8/28/06 position statement, where she argued that in calculating the alimony award amount, the family court should not have relied on Ferreira's tax returns because they were "unreliable in determining [Ferreira's] true financial situation and income for support purposes." She further argued that Certified Public Accountant James Kerr (Kerr) "testified [Ferreira's] reported income on his 1999, 2000 & 2001 tax returns reflected [Ferreira's] income from real estate sales only; evidence presented at trial proved and the family court found that Ferreira failed "to report income and claimed improper deductions from Unit 415"; the family court found that Ferreira had failed to report rental management income he collected in 2000 and other years; Ferreira testified that he had received real estate referral income; and Kerr testified that Ferreira failed to report $2,823.53 in real estate referral income Ferreira had received. She also argued that the family court should not have based its alimony calculation on the amount of rental income generated by Unit 415 in 2000 because it was reasonable to conclude that rental rates had risen since 2000 and potential rental income amounts would be higher.
The family court abused its discretion in relying on Ferriera's reported income amount for 2000 in calculating the alimony award because the court found in the Amended FOFs/COLs that Ferreira failed to report net rental income in the amount of $84,363.43 and rental management income he received in 2000. Therefore, the part of AFOF 22 that Marshall disputes is clearly erroneous.
With regard to Ferreira's alleged real estate referral income, at trial, Marshall testified that Ferreira received referral fees, which were fees paid to him for referring clients to other realtors. Marshall testified that in 2000 Ferreira received a $2,823 referral fee, which he did not deposit or report on his 1999 or 2000 federal tax returns. At trial, Ferreira testified that he had received only one referral fee of $3,000 in his 24 years of being a realtor. At trial, Kerr testified that he found evidence a realtor had paid Ferreira a referral fee in 2000, but Kerr was unable to find a deposit for that amount in any of Ferreira's accounts. Given the testimony provided at trial, the family court abused its discretion by failing to include the $3,000 in its calculation of Ferreira's average monthly income.
The family court did not abuse its discretion in basing its finding that Ferreira's future annual income would be $221,810.45 in part on amounts Ferreira earned from renting out Unit 415 in 2000. Even if the family court could have reasonably found that rental rates had risen since 2000 and Ferreira would earn more from renting out Unit 415 in the future than he had in 2000, Marshall provides no authority that the family court was required to make such findings, and we find no authority for this argument.

5. Appreciation on Assets
Marshall maintains the family court erroneously failed to impute to Ferreira appreciation on assets awarded to or hidden and diverted by him, whereas the court imputed to Marshall $3,900 in appreciation per year on assets awarded to her.
In the Second Amended Decree, the family court ordered Ferreira to pay Marshall $4,300 a month in alimony. Ferreira was to pay this amount to Marshall for six years, to give Marshall "the opportunity to further her education and improve her employment skills and to provide her with an opportunity to continue her lifestyle on an approximately equal basis with [Ferreira]" until she could "improve her earning power." The family court found that "it is reasonable to expect and impute earnings and appreciation on [Marshall's] total net assets of approximately $47,000 per year over the long term, or approximately $3,900/month." Then, in the part of the Post-Divorce Income Table summing up Marshall's post-divorce monthly net income, the family court imputed to Marshall $3,900 in estimated appreciation on assets awarded to her. The court did not include in the part of the Table summing up Ferreira's post-divorce monthly net income estimated appreciation on assets awarded to him.
Although the family court attempted to equalize Marshall and Ferreira's respective post-divorce monthly net incomes for the six years that Marshall would be making the transition back into the work force, we find no authority for the notion that the court was required to do so. See, e.g., Hubbard v. Hubbard, 656 So. 2d 124, 130 (Miss. 1995) ("`Rehabilitative periodic alimony' is not intended as an equalizer between the parties but is for the purpose of allowing the less able party to start anew without being destitute in the interim."); Hults, 11 So. 3d at 1280 ("[R]ehabilitative alimony is not meant to equalize a difference in income between parties.").
The second consideration in Cassiday required the family court, in deciding the amount of rehabilitative alimony in the instant case, to determine the income producing capability of the property awarded to Marshall to find out whether she could meet her needs independently, while the third Cassiday consideration required the court to determine the income producing capability of the property awarded to Ferreira for the sole purpose of determining what was Ferreira's ability to meet his own needs while also meeting Marshall's. 6 Haw. App. at 215, 716 P.2d at 1151. It is undisputed that Ferreira's ability to meet his own needs while paying $4,300 per month in alimony to Marshall was not an issue in this case.
Given the foregoing, the family court did not abuse its discretion by failing to include in its Post-Divorce Income Table estimated appreciation on assets awarded to Ferreira.

6. Inclusion of "Support payments"
Marshall argues that the family court "included support payments in its assessment and in so doing failed to consider post-divorce financial positions extend beyond satisfaction of support obligations." To the extent that we can understand her argument, Marshall misconstrues the family court's purpose in including the monthly alimony payment in its Post-Divorce Income Table. The part of the Table summing up Marshall's post-divorce monthly income includes the monthly alimony payment to show that for the six years Marshall received alimony, her post-divorce monthly net income would be roughly the same as Ferreira's. The Table does not represent what Marshall's post-divorce financial situation would be indefinitely.

7. Affect of Other Parts of Second Amended Decree on Alimony Award
Marshall contends the family court erroneously failed to amend its alimony award, even though this court vacated and remanded the award in the Amended Decree "because the decision as to spousal support [was] dependent on the decisions relating to child custody, visitation, and support, and the division and distribution of property and debts." Ferreira, 112 Hawai`i at 231, 145 P.3d at 774. This court did not hold that the family court was required to amend its alimony award, only that it reconsider it in light of its changes to the other parts of the Amended Decree. Id.

8. Result
The family court abused its discretion in (1) failing to state the amount of alimony Marshall would need to maintain the standard of living established during the marriage, pursuant to Cassiday; (2) awarding Marshall both one-half the net value of the Ekoa Place residence and awarding her the Ekoa Place residence as her solely held property; (3) failing to explain how Marshall "can maintain a residence for herself and the children while making income from the $733,680.69 net value of [the Ekoa Place residence] or its appreciation if any," Ferreira, 112 Hawai`i at 230 n.6, 145 P.3d at 773 n.6; and (4) basing its alimony award amount in part on the income amount Ferreira reported for 2000, without taking into account (a) $3,000 Ferreira earned in real estate referral fees in 2000, but failed to report, and (b) $84,363.43 Ferreira earned in net rental income in 2000, but failed to report. AFOF 61 and the subject portion of part VI. of the Second Amended Decree are clearly erroneous.

B. Child Support Award
Marshall argues that the family court incorrectly calculated the child support award because the court based its calculation on Ferreira's reported income, which the record proves "beyond a doubt" was "indisputably conservative." Related to this argument is Marshall's contention that part of AFOF 22, Second Amended FOF 23, and part V.B. of the Second Amended Decree are clearly erroneous.
AFOF 22 provides in relevant part that "the Court finds that averaging [Ferreira's] income for years 1999, 2000 and 2001 is a reasonable means of predicting [Ferreira's] future income for purposes of support."
Part V.B. of the Second Amended Decree provides as follows:
B. For purposes of determining child support [Ferreira's] annual, self-employment income before deductions for federal and state income taxes, but after deduction of reasonable business expenses and ½ of self-employment taxes is deemed to be $221,810.45. [Marshall's] gross monthly income is imputed to be $2000. Based on the [CSG] Worksheet prepared by [Marshall's] attorney, Valentina Stewart Watson, and signed by [Marshall], commencing from the date of divorce, [Ferreira] shall pay monthly child support to [Marshall] in the amount of $3,310.00.
In COLs 6 and 7 in the Amended FOFs/COLs, the family court concluded:
6. The Court concludes that [Ferreira's] child support should be determined by using the [CSG] with a deemed annual net income for [Ferreira] of $221,810.45, before state and federal taxes, but after deduction of one-half self-employment tax and after adjustment for unacceptable depreciation deductions. [Marshall's] gross monthly income is imputed to be $2,000.00.
7. The Court may impute reasonable income to [Marshall]. Saromines v. Saromines, 3 Haw. App. 20 (1982).
The Second Amended FOF 23 states:
23. This Finding of Fact is amended to provide that for purposes of child support calculations in accordance with the [CSG], [Ferreira's] gross income after deducting reasonable expenses is deemed to be $221,810.45.
Marshall argues that based on the CSG; Ferreira's 1999, 2000, and 2001 federal tax returns; AFOF 22 and the Second Amended FOF 23; and "all other relevant facts," the family court should have determined that Ferreira's gross income was $391,642 in 1999, $268,423 in 2000, and $376,782 in 2001, calculated as follows:

 1999 Tax Return 1999 Amended Tax
 Return
 GROSS INCOME
 From business $354,348 $37,294
 Interest $9,367
 Tax refund
 Federal $24,348
 State $11,810
 TOTAL GROSS INCOME $363,715 $391,642 or
 $32,363[/month]
 . . . .
 2000 TAX RETURNS
 GROSS INCOME
 From business $244,088
 Interest $12,067
 Tax refunds $12,268

 TOTAL GROSS INCOME $268,423 or
 $22,368[/month]
 2001 TAX RETURNS
 GROSS INCOME
 From business $359,865
 Interest $5,408
 Dividends $6,060
 Tax Refund $5,449
 TOTAL GROSS INCOME $376,782 or
 $31,399[/month]

(Emphases in original.)
Marshall argues that based on these gross income amounts, the child support payment should be $7,780 per month:

 Ferreira's average yearly gross income:
 1999 $ 391,642
 2000 $ 268,423
 2001 $ 376,782
 __________
 $1,036,847/3 = $345,615/yr.
 Ferreira's monthly child support obligation:
 $345,615/12 = $28,801 (Ferreira's average monthly gross
 income)
 - $ 4,300 (Ferreira's monthly alimony
 _______ payment)
 = $24,410 [sic]
 Application of CSG calculation to $24,410 = $7,780/mo.

In its Second Amended Decree, the family court stated that it had based its monthly child support award on the CSG worksheet prepared by Marshall's attorney and signed by Marshall. Marshall filed the CSG on January 20, 2004. In it, she stated that Ferreira's monthly gross income was $18,484 and that the amount of child support payable by him was $3,310 per month.
In Marshall's Motion for Reconsideration, her arguments were substantially similar to her arguments on appeal.
As we have already discussed, the family court abused its discretion in determining Ferreira's future income by relying on the income amount Ferreira reported for 2000 and failing to consider income Ferreira earned in 2000, but failed to report. Hence, the part of AFOF 22 that Marshall contests and the Second Amended FOF 23 are clearly erroneous, as is the portion of part V.B. of the Second Amended Decree in which the family court states that Ferreira's "annual, self-employment income before deductions for federal and state income taxes, but after deduction of reasonable business expenses and self-employment taxes is deemed to be $221,810.45."
In her summary of Ferreira's alleged actual gross income amounts for years 1999, 2000, and 2001, Marshall includes "interest" and "tax refunds" for each year, but does not explain what "interest" represents and does not provide authority for her assertion that "tax refunds" should be included within the category of gross annual income. Further, she does not explain from where she derives the "actual" gross income amounts. We are unpersuaded that the family court should have calculated Ferreira's income as Marshall suggests.

C. Property Division
Marshall alleges that the property division is inequitable because the family court, in dividing the property, "fail[ed] to consider all relevant facts affecting the value of the marital estate and the parties' financial positions" and "ignored clear and convincing evidence" of additional instances of Ferreira's wasting of marital estate assets. Related to this argument is Marshall's contention that part VII.C. of the Second Amended Decree, AFOFs 21 and 44, and parts of AFOFs 47, 48, 57, and 61 are clearly erroneous.
In Tougas, 76 Hawai`i at 26, 868 P.2d at 444 (footnote omitted), the Hawai`i Supreme Court stated:
In Gussin, this court emphasized the wide discretion conferred upon the family court by HRS § 580-47 (Supp. 1992). Quoting Myers v. Myers, 70 Haw. 143, 148-49, 764 P.2d 1237, 1241 (1988), we expanded upon the above maxim:
"[t]here is . . . no fixed rule for determining the amount of property to be awarded each spouse in a divorce action other than as set forth in HRS § 580-47." Au Hoy v. Au Hoy, 60 Haw. 354, 357, 590 P.2d 80, 82 (1979). Section 580-47 "gives to the family court the discretion to divide marital property according to what is just and equitable[,]" Cassiday[, 68 Haw. at 388, 716 P.2d at 1137] (citation omitted) . . . .
When the directive to the court is to do what is just and equitable in the circumstances, "[o]f course, each case must be decided upon its own facts and circumstances." Carson v. Carson, 50 Haw. 182, 183, 436 P.2d 7, 9 (1967). This "do[es] not mean that the. . . court may do whatever pleases it. [A grant of discretion] means instead that the court has a range of choice, and that its decision will not be disturbed as long as it stays within that range and is not influenced by any mistake of law." Kern v. TXO Prod. Corp., 738 F.2d 968, 970 (8th Cir. 1984).
In Gussin, the court further articulated:
"[d]iscretion" denotes the absence of a hard and fast rule. [Citation omitted.] When involved as a guide to judicial action it means a sound discretion, that is to say, a discretion exercised not arbitrarily or wilfully, but with regard to what is right and equitable under the circumstances and the law, and directed by the reason and conscience of the judge to a just result.

Gussin, 73 Haw. at 479, 836 P.2d at 489 (citations omitted).
With this broad brush of discretion, we have "avoided, where possible, the adoption of general rules governing the division of marital assets," because such general rules create rebuttable presumptions that narrow the discretion of family court judges and are thus repugnant to HRS § 580-47. Gussin, 73 Haw. at 480, 836 P.2d at 489 (1992) (citations omitted).
In Helbush v. Helbush, 108 Hawai`i 508, 512-13, 122 P.3d 288, 292-93 (App. 2005) (emphasis omitted; brackets in original), this court stated that
the following precedent guides the family court when deciding how to categorize, divide and distribute Marital Partnership Property:
. . . [T]he family court can . . . utilize the construct of five categories of net market values (NMVs) in divorce cases:
Category 1. The net market value (NMV), plus or minus, of all property separately owned by one spouse on the date of marriage (DOM) but excluding the NMV attributable to property that is subsequently legally gifted by the owner to the other spouse, to both spouses, or to a third party.
Category 2. The increase in the NMV of all property whose NMV on the DOM is included in category 1 and that the owner separately owns continuously from the DOM to the DOCOEPOT [date of the conclusion of the evidentiary part of the trial].
Category 3. The date-of-acquisition NMV, plus or minus, of property separately acquired by gift or inheritance during the marriage but excluding the NMV attributable to property that is subsequently legally gifted by the owner to the other spouse, to both spouses, or to a third party.
Category 4. The increase in the NMV of all property whose NMV on the date of acquisition during the marriage is included in category 3 and that the owner separately owns continuously from the date of acquisition to the DOCOEPOT.
Category 5. The difference between the NMVs, plus or minus, of all property owned by one or both of the spouses on the DOCOEPOT minus the NMVs, plus or minus, includable in categories 1, 2, 3, and 4.

Malek v. Malek, 7 Haw. App. 377, 380-81 n.1, 768 P.2d 243, 246-47 n.1 (1989).
The NMVs in Categories 1 and 3 are the parties' capital contributions to the marital partnership. The NMVs in Categories 2 and 4 are the during-the-marriage increase in the NMVs of the Categories 1 and 3 properties owned at DOCOEPOT. Category 5 is the DOCOEPOT NMV in excess of the Categories 1, 2, 3, and 4 NMVs. In other words, Category 5 is the net profit or loss of the marital partnership after deducting the partners' capital contributions and the during-the-marriage increase in the NMV of property that was a capital contribution to the partnership and is still owned at DOCOEPOT.

Gardner v. Gardner, 8 Haw. App. 461, [466], 810 P.2d 239, [242] (1991).
In Antolik v. Harvey, 7 Haw. App. 313, 318-19, 761 P.2d 305, 309 (1988), this court stated the following with regard to valuation of assets in divorce property division:
When dividing and distributing the value of the property of the parties in a divorce case, the relevant value is, as a general rule, the fair market value (FMV) of the parties' interest therein on the relevant date. We define the FMV as being the amount at which an item would change hands from a willing seller to a willing buyer, neither being under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts.

1. Taxes on Alaneo Place
Marshall maintains the family court erred by "fail[ing] to acknowledge and consider taxes [sic] consequences on the sale of . . . Alaneo Place." In support of this argument, she cites to Gardner and Jackson.
Gardner is inapplicable to this point of error. There, this court held that the family court had erroneously found that the husband was responsible for capital gains tax realized on the sale of the parties' property. 8 Haw. App. at 471-73 & 487, 810 P.2d at 245-46 & 248. However Jackson applies. There, this court held that
if the sale of a Marital Partnership Property is not explicitly or implicitly ordered or enforceably promised, the family court is not allowed to consider the tax ramification of that sale. On the other hand, if the sale of Marital Partnership Property is explicitly or implicitly ordered or enforceably promised, the family court must consider the tax ramification of the sale.
84 Hawai`i at 334, 933 P.2d at 1368 (footnote omitted). In footnote nine, this court stated: "If a property is awarded to the husband and he is explicitly or implicitly ordered to sell it and pay the wife one-half of the net before taxes, the distribution is not 50-50 because the wife receives 50% and the husband receives 50%, less the taxes." Id. at 334 n.9, 933 P.2d at 1368 n.9.
Section VII.E. of the Second Amended Decree provides, in relevant part, the following with regard to the division and distribution of Alaneo Place:
3. . . . Alaneo Place. To effectively accomplish the fair and just division of the marital estate, the real property of the parties located at . . . Alaneo Place, currently held by the parties as Tenants by the Entirety, shall be immediately sold by the parties. To achieve a fair and just distribution of the parties['] assets the entire net proceeds from the sale, less $39,131.77, shall be awarded to [Marshall]. (The net proceeds shall be the amount left after deducting from the sales price received, the payoff of the underlying mortgage, sellers' costs of escrow, the real estate commission actually paid by the seller, the sellers' cost of document preparation, and the sellers' cost of a title report confirming marketable title.[)] In addition, [Ferreira] shall pay and receive a credit for any fix-up expenses that are necessary and reasonable to complete the early and timely sale of the real property at the best net gain. However, if proceeds of sales are used by escrow to pay off [Ferriera's] attorney's fees, due to possible liens or otherwise, such amounts shall not be considered a deduction in calculating net proceeds, and shall be credited entirely against [Ferreira], who shall be solely responsible therefor [sic].) $39,131.77 of the proceeds are awarded to [Ferreira] to achieve fair and just distribution of the parties['] assets. However, if the net proceeds from the sale exceed $266,856.04, the excess above that amount shall be divided equally between the parties. Likewise, if the net proceeds are less than that amount, one-half the difference shall be deducted from the $39,131.77 of the proceeds awarded to [Ferreira] above.
(Emphasis in original.)
Part X.D. of the Second Amended Decree, titled "Tax and Tax Consequences," provides in relevant part:
3. Tax on Gains. Except as may be otherwise specifically provided herein, each party shall be solely responsible for and pay the tax, if any, on the gain realized from the sale of the real and/or personal property being awarded to him or her under this Decree.
. . . .
6. Tax Consequences of Property Division. It is understood that it is assumed and intended that the division of property incident to the parties' divorce shall not itself result in any tax consequences, that each party will take each property interest awarded to him or her at its pre-divorce basis, and that any tax which must be paid upon the subsequent sale or exchange of any such interest shall be paid by the party who received and subsequently sold or exchanged such interest. If the actual tax consequences of the divorce are different from the consequences which are assumed and intended, the party who received the unintended benefit shall make payment to the other party as and for property division in an amount necessary to, inasmuch as possible, place the parties in the same relative position they would have enjoyed had there been no unexpected tax consequences. Except as otherwise limited by statute, court rule or case authority, the [family court] shall have continuing jurisdiction to reallocate such tax burden(s) between the parties.
We agree that the family court failed to acknowledge and consider tax consequences of the sale of Alaneo Place. The family court ordered the parties to sell Alaneo Place and awarded the entire net proceeds of the sale to Marshall, except for $39,131.77, which the court awarded to Ferreira. The family court then stated that "each party shall be solely responsible for and pay the tax, if any, on the gain realized from the sale of the real . . . property being awarded to him or her under this Decree" and "each party will take each property interest awarded to him or her at its pre-divorce basis, and . . . any tax which must be paid upon the subsequent sale or exchange of any such interest shall be paid by the party who received and subsequently sold or exchanged such interest." The family court did not state whether Marshall and Ferreira would each pay an equal amount of any taxes resulting from the sale of Alaneo Place or how the court's order regarding the payment of taxes upon the sale of Alaneo Place factored into the court's attempt to "achieve a fair and just distribution of the parties['] assets."
Furthermore, although Marshall does not raise this point on appeal, the family court plainly erred by awarding Marshall the entire net proceeds of the sale of Alaneo Place, minus $39,131.77, while also awarding Marshall half the value of Alaneo Place, or half of $258,773.28. Part VII.C. of the Second Amended Decree is clearly erroneous. On remand, the family court may grant Marshall either the net proceeds of Alaneo Place or one-half of the value of the property, but not both.

2. Repair Debts
Marshall argues that in dividing the marital property, the family court erroneously failed to "consider" the debt she would incur to make necessary repairs to the Ekoa Place residence. To support this argument, she cites to the 8/28/06 position statement and a supplemental position statement she filed on October 2, 2006 (collectively, the position statements). In the position statements, Marshall argued that in the family court's division of property and analysis of Marshall's post-divorce financial situation, the court erroneously failed to order that necessary repairs to the Ekoa Place residence be paid from the marital estate, as ordered by Judge Eric G. Romanchak on August 5, 2002. She contended that rather than use marital assets to make repairs to the residence while he was living there, Ferreira had bought, among other things, a Harley Davidson motorcycle; a trip to Paris, France; and a Cadillac.
At trial, Paul Signore (Signore), a building inspector, testified as an expert on residential real estate inspection that the Ekoa Place residence required around $90,000 to $100,000 in necessary repairs.
In the Second Amended Decree, the family court awarded the Ekoa Place residence to Marshall and decreed that Marshall "shall be entitled to sole, exclusive occupancy of the said property and shall be solely responsible for payment of and shall indemnify and hold [Ferreira] harmless from all debts on said property." In the Amended FOFs/COLs, the family court found the following:
16. If this Court were to award [Marshall] an additional $43,000.00, as requested by [Marshall], to restore/repair/improve the [Ekoa Place residence], the property would be improved; it would be placed in [sic] different condition than it's [sic] appraised values, and it's [sic] value would be an unknown, higher amount. After the divorce [Marshall] through sale of assets and/or refinancing will have adequate monies to perform the repairs and improvements she desires. Moreover, she alone will receive the full benefit of such expenditures.
In dividing the marital assets, the family court took into account the value of the Ekoa Place residence at the time of divorce and did not deduct $90,000 or $100,000, based on Signore's testimony, from the residence's stipulated value of $757,500. However, the family court took into account the cost of necessary repairs to the residence when dividing the marital property. The family court did not abuse its discretion.

3. Unit 415
Marshall argues that the family court erroneously relied on Ferreira's opinion regarding the value of Unit 415, where Ferreira "was clearly unable to deliver an unbiased professional appraisal." Related to this argument is her contention that AFOF 44 is clearly erroneous. In AFOFs 20 and 44, the family court found that the net value of Unit 415 was $480,728.77.
At trial, Ted Yamamura (Yamamura), a licensed appraiser, testified as an expert in residential real estate appraisal that the value of Unit 415 was $850,000. Steve Parker, a licensed appraiser, who the family court also qualified as an expert in residential real estate appraisal, testified that the value of the unit was $700,000. The family court qualified Ferreira as an expert on Kanaapali Alii condominium values and sales for the purpose of testifying as to the value of Unit 415. Ferreira testified that he did not believe Yamamura's appraisal was accurate for various reasons, Parker's appraisal was "much closer to the mark," and the fair market value of the unit, in Ferreira's opinion, was "between seven and seven and a quarter."
"[I]t is well-settled that an appellate court will not pass upon issues dependent upon the credibility of witnesses and the weight of the evidence; this is the province of the trier of fact." Inoue v. Inoue, 118 Hawai`i 86, 101, 185 P.3d 834, 849 (App.), cert. rejected, 118 Hawai`i 194, 186 P.3d 629 (2008) (internal quotation marks and citation omitted). Marshall provides no authority for the notion that the family court must base its valuation of marital assets on professional appraisals, and we find none. AFOF 44 is not clearly erroneous.
Marshall also argues that the family court erroneously failed to consider Unit 415's earning potential in valuing the unit for the purpose of dividing the marital property. In the Amended FOFs/COLs, the family court found that Ferreira had earned $84,363.43 in rental income from Unit 415, but did not find that it had considered potential future rental income from the unit in assigning the unit a value. Marshall suggests that the family court not only should have taken into account Unit 415's earning potential when valuing the unit for the purpose of dividing the marital assets, the court should have considered that the unit's earning potential had "risen substantially since the year 2000" and would be greater than $84,363.43.
With certain exceptions, everything of present or prospective value is property subject to division incident to divorce as part of the "marital estate" pursuant to HRS § 580-47. See Linson v. Linson, 1 Haw. App. 272, 278, 618 P.2d 748, 751 (1980) (holding that the marital estate includes "anything of present or prospective value"). However, we fail to see why the court should have taken into account potential rental income from Unit 415 when valuing the unit. For the purpose of dividing the marital assets, rental income from Unit 415 pertained to Ferreira's income, not the unit's value. See AFOF 48 (where the family court found "that rental of [Unit 415] is available to [Ferreira] as a source of income, especially when sales are lagging"). The family court did not abuse its discretion, and AFOF 44 is not clearly erroneous.

4. KRR
AFOFs 18 and 21 provide:
18. [Ferreira] is employed as a realtor and owns the [KRR]. [KRR] is a solely held proprietorship, and [Ferreira] is the only realtor employed at [KRR].
. . . .
21. The Court is unable to satisfactorily determine by a preponderance of the evidence the intrinsic value of [Ferreira's] business known as [KRR], and even if the Court were able to do so, there is no substantial evidence as to the impact its sale would have on [Ferreira's] future income.
Marshall argues that the family court erred by failing to assign a value to KRR and identify it as marital asset. She maintains the family court should have relied on the testimony of her expert witness, Michael Capuano (Capuano), who assigned KRR a value of $332,000 and included it in the marital estate. In support of this argument, Marshall cites to two cases outside of this jurisdiction. Related to this argument is Marshall's contention that AFOF 21 is clearly erroneous.
At trial, the family court qualified Capuano as an expert witness in the fields of business valuation, business brokerage, and sales of businesses. Capuano testified that in the business profile and evaluation he had prepared for KRR, he arrived at a fair market value of $332,000 or, if sold for cash, $265,000. He testified on cross-examination that he would list KRR for sale at $304,220 or, for cash, $295,680. On cross-examination, Capuano further testified that he did not know how many of Ferreira's former clients had purchased properties more than once; had not personally seen Unit 415, and had never talked to Ferreira. The family court asked Capuano numerous questions that called into question Capuano's valuation of KRR, particularly his valuation of goodwill, which Capuano testified he had included in his valuation of KRR and which was worth around $299,000.
"[I]t is well-settled that an appellate court will not pass upon issues dependent upon the credibility of witnesses and the weight of the evidence; this is the province of the trier of fact." Inoue, 118 Hawai`i at 101, 185 P.3d at 849 (internal quotation marks and citation omitted). The family court found that it could not rely on Capuano's valuation, which was within the court's discretion, and the court did not abuse its discretion in doing so. AFOF 21 is not clearly erroneous.

5. Ferreira's Economic Misconduct
Marshall contends the family court breached its "duty to hold [Ferreira] accountable" for his wasting of marital assets and should have included the following in the property division and equalization award.

(a) Cash Savings
Marshall claims the family court should have included in the marital estate $733,625 in "cash savings" that Ferreira wasted. She argues that the $733,635 represents $447,000 Marshall claims was available to the parties at the time they were separated in August 2001, plus 10% simple annual interest that had accrued from August 2001 to January 2008.
Marshall argues that Ferreira admitted in his trial testimony that the parties had $447,000 available in cash accounts in August 2001 (just prior to the second divorce action), but when he put the Alaneo Place property on the market a year and a half later, "there was [sic] no funds like that available."
In a Motion and Affidavit for Pre-Decree Relief (Ferreira's Pre-Decree Relief Motion) filed on December 3, 2002, Ferreira requested, inter alia, that the family court grant him permission to sell Alaneo Place so that he could "use the proceeds from the sale to pay for the estimated tax payments and the family monthly obligations." He stated that his income had declined by more that 75% from the previous year (from $360,000 down to $90,000) and apparently would not increase in the foreseeable future. At trial, Ferreira testified that he needed to sell Alaneo Place because "[w]e need the money to support" [sic]. When asked on cross-examination if he had any idea how much cash he and Marshall had available to them at the end of August 2001, Ferreira testified that he did not. When asked whether he knew there was $447,000 in cash available to the parties as of the end of August 2001, Ferreira responded, "If you say there is, I will say yes."
Marshall cites to insufficient evidence that the $447,000 existed at the end of August 2001. This court is not obligated to sift through the voluminous record to verify an appellant's inadequately documented contentions. Miyamoto v. Lum, 104 Hawai`i 1, 11 n.14, 84 P.3d 509, 519 n.14 (2004). Hence, we cannot say that the family court abused its discretion by failing to identify $447,000 in missing assets attributable to Ferreira's wasting and awarding Marshall half of that amount.
To support this argument, Marshall asserts that a comparison of Ferreira's conduct after Marshall filed for divorce in December 2000 (the first divorce action) and the second divorce action reveals Ferreira's pattern of attempting to minimize his income so as to pay less support and devalue his business and eliminate and/or minimize assets subject to division, including the $447,000 plus interest Marshall claims he wasted. At trial, Marshall testified extensively as to Ferreira's alleged attempts to minimize his income in contemplation of divorce. Nevertheless, the family court did not abuse its discretion in failing to infer that Ferreira wasted the parties' alleged $447,000 in cash savings, based on such testimony.

(b) Lost Rental Income
Marshall maintains the family court should have included in the marital estate $118,993 in rental income she and Ferreira "lost" because Ferreira refused to rent out Alaneo Place and Unit 415 "during the divorce." Marshall argues that by not including this amount in the marital estate, the court breached its duty to hold Ferreira accountable for wasting.
At trial, Marshall testified that in April 2000, Ferreira evicted tenants renting Alaneo Place and in May 2002, Stacey moved in. Marshall testified that Ferreira had not rented out Alaneo Place for those two years because, he claimed, there was a crack in the tub and the property had no electricity for a year; however, the crack was small and could have been repaired with fiberglass or the whole tub enclosure could have been repaired for about $350, and Ferreira had refused to fix the electricity for year before hiring an electrician to repair it for approximately $800.
Ferreira testified that he had not failed to rent out Alaneo Place to keep his income low in contemplation of divorce, but because he had been in the process of having a mason build a pedestal for the tub. He stated that he had tried to repair the crack in the tub three times. He also testified that he had not rented out the property because there had been no electricity while he had electrical panels installed according to the specifications of Maui Electric Company (MEC). The family court admitted into evidence Defense Exhibit YY, a document Ferreira testified showed when MEC stopped providing electricity to Alaneo Place and when MEC later resumed providing it. The document, entitled "CUSTOMER ADD/CHANGE," appears to indicate that the electricity was cut off on September 7, 2000 and provided again on October 3, 2001.
At trial, Marshall testified she and Ferreira had rental bookings for Unit 415 "almost 100 percent in 2000" and "were booking it into 2001," when Ferreira told her that he was going to reside in the unit in 2000 and 2001 and had canceled all of the 2000 bookings. Marshall did not know what happened to the 2001 bookings. She then learned by examining exhibits Ferreira submitted in connection with the divorce that Ferreira had rented out the unit in 2000. Kerr testified that Ferreira rented out the unit for 267 days in 2000. Ferreira testified that at some point, he stopped renting out Unit 415 because he was living there.
Given that "[t]he appellate court will neither reconcile conflicting evidence nor interfere with the decision of the trier of fact based on the witnesses' credibility or the weight of the evidence," State v. Gaston, 108 Hawai`i 308, 311, 119 P.3d 616, 619 (2005) (internal quotation marks and citation omitted), we decline to hold that the family court erred by failing to find Ferreira had refused to rent out Unit 415 and Alaneo Place for the purpose of lowering his income in contemplation of divorce and failing to include in the marital estate $118,993 in lost rental income.

(c) Rental Management Income
Marshall contends the family court erred by disregarding Kerr's testimony and failing to award her $152,120 plus interest in rental income Ferreira hid from the marital estate and failed to report on his income tax returns. Related to this argument is Marshall's contention that part of AFOF 48 is clearly erroneous. AFOF 48 provides in relevant part that "in 2000 [Ferreira] failed to report rental and rental management income"; "there is reliable information from which to conclude by a preponderance of the evidence that gross rental income of $84,363.43 was unreported and diverted from the marital assets"; and "[t]he Court therefore finds by a preponderance of the evidence that in 2000 [Ferreira] received $84,363.43 in unreported rental income for [Unit 415] and unreported rental management income, which was diverted from the marital assets." (Emphasis added.) Marshall maintains that $84,363.43 represented unreported rental income only, not rental management income.
At trial, Marshall testified that Ferreira managed properties and had probably started doing so around the beginning of 2000. Marshall stated that in 1999 Ferreira talked to her about his plans to start a rental management business and showed her a document indicating that he could potentially earn about $150,000 from such a business (admitted into evidence as Plaintiff's Exhibit 103). Later, while cleaning up the Alaneo Place cottage, Marshall found a file on the rentals (admitted into evidence as Plaintiff's Exhibit 31).
The family court admitted into evidence Plaintiff's Exhibit 30, Kerr's report of his initial investigation into the parties' financial records for the years 1999 through 2001. In part one of the report, Kerr determined that Ferreira failed to report any income besides real estate commission income on his 1999, 2000, or 2001 federal tax returns. In part two, Kerr investigated whether Ferreira had failed to report on his tax returns or deposit into community accounts any other income he had earned, such as income earned from renting out Unit 415 and Alaneo Place or from managing non-Unit 415 rentals. Kerr testified that by the end of May 2003, the parties should have had $270,000 in cash available to them, but they only had $41,000.
Kerr testified that in 2000 and 2001, Ferreira made $152,120 in rental management income. When asked on cross-examination whether he knew for certain whether Ferreira had managed the rental of any non-Unit 415 units, Kerr testified that he had seen contracts and evidence of exchanges of money and services rendered. Kerr stated that he had not seen any "transactions," meaning contracts and confirmations, for years besides 2000. Kerr had attributed to Ferreira rental management income from 2001 based on the assumption that because Kerr had seen a transaction indicating Ferreira had managed non-Unit 415 rentals in 2000, Ferreira had managed such rentals in 2001 and 2002, as well. On redirect examination, Kerr testified that he had seen confirmations evincing rental management income earned in 2001.
Ferreira testified that he did not have a "rental business" and had only handled six rental bookings for customers at the Kaanapali Alii. He stated that Exhibit 103 was a list of rental rates for units in different categories, which he would refer to when approached by a potential renter. He only referred to the list on the six occasions he had handled rental bookings at the Kaanapali Alii. He testified that he had no idea what Kerr was referring to when Kerr testified that the parties should have had $270,000 available to them at the end of May 2003.
A review of AFOF 48 as a whole reveals that the family court found that the $84,363.43 represented missing rental income, not rental management income. Consequently, the portion of AFOF 48 that Marshall contests is clearly erroneous. Further, we do not comprehend why the family court failed to include in its missing income amount unreported rental management income earned by Ferreira in 2000 or find that it could not determine the amount of such income, when the court had found that there was a preponderance of the evidence that Ferreira received such income. This was an abuse of discretion.

(d) Unit 415 Rental Income
Marshall contends the family court erroneously failed to attribute to Ferreira income he made from renting out Unit 415 in years besides 2000, when dividing the marital assets. AFOF 48 provides:
48. MISSING INCOME. Based on the testimony of [Kerr], the evidence adduced and a review of the parties['] tax returns in evidence, the Court finds that in July 1998 commission income for two Kaanapali Alii condo sales by [Ferreira] is missing and unreported. But, so far as division of marital property is concerned, these amounts are included in the missing amounts discussed above. The Court finds by a preponderance of the evidence that in 2000 [Ferreira] failed to report rental and rental management income. Pursuant to Exhibit 30 in evidence, Analysis of 2000 rental income, the testimony of [Kerr] and the parties['] income tax returns, it appears there is reliable information from which to conclude by a preponderance of the evidence that gross rental income of $84,363.43 was unreported and diverted from the marital assets. Moreover, there is substantial evidence that this is net and not gross income to [Ferreira], based in part on the fact that the tax returns already show deductions for depreciation of [Unit 415] and because [Ferreira] is renting his own unit.
The Court therefore finds by a preponderance of the evidence that in 2000 [Ferreira] received $84,363.43 in unreported rental income for [Unit 415] and unreported rental management income, which was diverted from the marital assets. [Marshall's] one-half therefore equals $42,181.72.
The Court further finds by a preponderance of the evidence that [Ferreira] received additional rental income and rental management income for the year 2000 and other years, and that [Ferreira] failed to report any of the rental income he received on his state and federal income tax returns for the years in question in this matter. However, while the Court finds that rental income is being unreported, hidden and diverted, it is unable by a preponderance of the evidence to come to any reasonable determination of an amount for other years. [Kerr] made assumptions that it was reasonable to impute levels of income in other years, but the Court does not find that there is sufficient evidence to corroborate or to form an independent basis for concurring with such assumptions and reaching conclusions as to specific amounts. Moreover, in the future the Court is unable to find by a preponderance of the evidence that [Ferreira's] annual income, as determined by the Court herein, will be increased by renting [Unit 415], as it is unclear whether it may be more cost efficient to forgo rent and have unlimited access to potential real estate customers or to what extent it would be cost effective to do so. Moreover, to do so would require that [Ferreira] seek alternate housing at some additional, unknown expense. However, the Court does find that rental of [Unit 415] is available to [Ferreira] as a source of income, especially when sales are lagging.
(Emphasis added.)
At trial, Ferreira testified that he rented out Unit 415 "quite a bit" in 1999 and then testified that he did not report any 1999 rental income from the unit on his tax return because he "forgot because it was a very, very little amount" and he "didn't keep an accurate accounting." He stated that he rented out Unit 415 in 2000 "more than half of the time."
Kerr testified he had determined that Unit 415 had been rented out for 9 months in 1999 and generated $63,000 in rental income that year. He stated that Ferreira reported on his federal tax return $26,000 in rental income in 1999, even though Ferreira testified that he rented out Unit 415 "quite a bit" that year. However, Kerr had no records indicating that Unit 415 had been rented out at that time and could not say that Ferreira received rental income beyond the $26,000. When asked whether he could confirm any other rental activity relating to Unit 415 for the year 2001, Kerr testified:
A. [Kerr] Well, by 2001 the records started evaporating. I didn't have any confirmations or contracts, but I did have checks and payments indicating that there was activity in the  in the unit, that unit [Unit 415] or other units; payments to other owners, payments to service providers.
There were a couple of occasions where we had indication of an exchange of money, although they were not deposited. There were checks, xerox copies of checks.
Q. [Marshall's attorney] Payable to Mr. Ferreira?
A. Yes.
Kerr later testified that Unit 415 generated $70,000 in rental income over 10 months in 2001. Kerr stated that "there's very, very, very strong evidence that [Unit 415] was rented, but there's no  there's no record of deposits."
On cross-examination, Kerr testified that he had not subpoenaed any of the bank statements he analyzed, but had been given them by Marshall. He found those statements to be reliable because he cross-referenced them to other documents.
Given that "[t]he appellate court will neither reconcile conflicting evidence nor interfere with the decision of the trier of fact based on the witnesses' credibility or the weight of the evidence," Gaston, 108 Hawaii at 311, 119 P.3d at 619 (internal quotation marks and citation omitted), we decline to hold that the family court erred by failing to attribute to Ferreira income he made from renting out Unit 415 in years besides 2000, when dividing the marital assets.

(e) Interest on Missing Assets/Income
In AFOF 48, the family court found that "by a preponderance of the evidence that in 2000 [Ferreira] received $84,363.43 in unreported rental income for [Unit 415] and unreported rental management income, which was diverted from the marital assets. [Marshall's] one-half therefore equals $42,181.72."
Second Amended FOF 54 provides:
54. The Court further finds that the evidence is clear and convincing that the following amounts are missing:
 Missing Assets: $116,386.07
 Missing Income: $84,363.43
The Court hereby finds that [Marshall] is entitled to an additional award of the entire, known missing assets of $116,386.08 and the entire, known missing rental income of $84,363.44. [Marshall] is therefore entitled to an award of the remaining assets in the amount of $961,404.97.
(Emphasis in original.)
Marshall argues that the family court should have included 10% simple annual interest on the $84,363.43 and $116,386.07 the court found Ferreira had hidden or diverted. Marshall provides no authority for this assertion, and we find none in this jurisdiction. Therefore, we cannot hold that the family court abused its discretion in failing to award Marshall 10% simple annual interest on the $116,386 and $84,363 awarded to her.

6. Equalization Award
Part VII.D. of the Second Amended Decree provides:
D. Equalization award.
1. The Intermediate Court of Appeals at page 4 of its opinion issued June 20, 2006 states, "There is no indication that the court imposed any penalty on [Ferreira] for hiding assets and income. If a party who hides assets suffers no penalty for doing so, what is a party's incentive not to do so?" There is no Hawaii law on this issue, but in the case of Sands v. Sands, 192 Mich. App. 698, 482 N.W. 203 (1992) the appellate court states ". . . we find it inappropriate for the court to award Mr. Sands any share of assets he attempted to conceal. Once a spouse intentionally has misled the court or the opposing spouse regarding the existence of an asset, that spouse should be estopped from receiving any part of that property." The appellate court then directed the trial court "to award full ownership of these particular assets or their equivalent value to Mr. Sands before making an equal split of remaining assets." This Court adopts the reasoning of the Michigan appellate court and finds that there is clear and convincing evidence that [Ferreira] attempted to conceal certain assets and that therefore [Marshall] is entitled to an award of the entire missing assets of $116,386.07 and the entire known, missing rental income of $84,363.43. [Marshall] is therefor [sic] entitled to an award of the remaining assets in the amount of $961,404.97.
(Emphasis in original.)
Marshall contends the family court's equalization payment to her was inadequate and did not take into account the full extent of Ferreira's economic misconduct and its negative impact on the marital estate. Given our holdings in Parts III.A.8 and III.C.1 and 5 of this discussion, we need not address this point.

7. Parties' Respective Post-Divorce Financial Positions
Marshall argues that parts of AFOFs 57 and 61 are clearly erroneous because it is untrue that the property division will allow Marshall to "never work again" and to continue her lifestyle on an "approximate equal basis" with Ferreira. To support this argument, Marshall cites to a case outside of this jurisdiction. AFOF 57 provides that "as a result of the property division in this divorce, [Marshall] will become financially independent and may never need to work or work full time." AFOF 61 provides that the alimony award will provide Marshall "with the opportunity to continue her lifestyle on an approximately equal basis with [Ferreira]."
Marshall also argues that AFOF 30 is clearly erroneous because the family court therein failed to sufficiently assess Ferreira's post-divorce financial position. AFOF 30 provides that Marshall "is currently capable of earning income in the amount of at least $2,000.00 per month and that amount should be imputed to her. But [Ferreira] has an earning ability far superior to [Marshall] and will continue to have a superior earning ability into the indefinite future."
Given our holdings in Parts III.A.8 and III.C.1 and 5 of this discussion, we need not address this point.

8. Result
The family court abused its discretion by failing to include in its missing income amount unreported rental management income earned by Ferreira in 2000 or find that it could not determine the amount of such, when the court had found that there was a preponderance of the evidence that Ferreira received such income. The family court also abused its discretion by failing to acknowledge and consider tax consequences of the sale of Alaneo Place and plainly erred by awarding Marshall the entire net proceeds of the sale of Alaneo Place, minus $39,131.77, while also awarding Marshall half Alaneo Place's value, or half of $258,773.28. Part VII.C. of the Second Amended Decree is clearly erroneous.

IV. CONCLUSION
The Post-Appeal Amended and Restated Decree Granting Absolute Divorce and Awarding Child Custody filed on September 6, 2007; the Post Appeal Findings of Fact and Conclusions of Law filed on September 6, 2007; and the "Order on Defendant's Motion for Reconsideration Filed Sept. 17, 2007 and Plaintiff's Motion to Reconsider Post Appeal Amended and Restated Decree Granting Divorce and Awarding Child Custody Filed Sept. 24, 2007" filed on December 3, 2007, in the Family Court of the Second Circuit, are vacated, and this case is remanded for further proceedings consistent with this opinion.
NOTES
[1] Per diem Family Court Judge Barclay E. McDonald presided.
[2] Although the family court refers to the income amounts listed in AFOF 22 as "net," it is clear from a review of the record on appeal that the figures actually represent gross income minus deductions, but before federal and state income taxes. In our discussion, we refer to the amounts as "income."
[3] A Schedule "C" is where business activity is reported on a federal tax return.
[4] The amount of income listed on Schedule C of Ferreira's 1999 federal tax return is $213,555.
[5] AFOFs 10 and 11 provide:

10. The Report on Investigation on Child Custody and Access dated October 4, 2000 in FC-D XX-X-XXXX pertaining to the children of the parties (the "Social Study") is helpful to the Court in determination of the issue of legal custody in this matter.
11. Roberta Goldberg, the Court Officer who prepared the Social Study and who testified at the trial in this matter, is experienced and knowledgeable with respect to issues of legal custody and with the issue of custody in this matter, and the Court hereby adopts her recommendation that sole legal and physical custody of the minor children shall be awarded to [Marshall], subject to [Ferreira's] right of reasonable visitation.
The Amended Decree states that "[t]he [CSEA] is hereby made a party to this action for the limited purpose of child support."
[6] We note that the numbers set forth in the Table do not add up to $1,521.310.93.